**WO**

1

2

3

4

5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Thomas Lovejoy and Carolynn Lovejoy, | ) | CV 09-1912-PHX-NWW |
| | ) | |
| Plaintiffs, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| Sheriff Joseph Arpaio, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the Court is Defendants' Motion to Dismiss (doc. #10), which the Court grants in part and denies in part.

**I.    The Allegations of the Complaint**

Plaintiffs make the following allegations in their complaint. It bears emphasis that the recitation that follows is only what Plaintiffs allege; the Court is not now called upon to determine the extent to which those allegations are true. Thomas Lovejoy was a well-respected sergeant in the Chandler Police Department for fifteen years before the events alleged herein took place. In January 2003, Sgt. Lovejoy was promoted to the K9 unit and partnered with his first dog, Bandit. Over the next four years, Sgt. Lovejoy and Bandit worked together. During that time, Sgt. Lovejoy developed an impeccable record with the K9 division, rescuing dogs and raising funds to purchase additional dogs, in addition to performing his regular duties.

Sgt. Lovejoy took good care of Bandit.  Bandit shared a large backyard with Sgt. Lovejoy's other dogs, but also had special accommodations.  Bandit had a 20' x 10' kennel that was shaded with plants and swamp air cooled.  He also had three drinking stations and his own stock tank where he could immerse himself fully in water to cool off during hot summer days.

Sgt. Lovejoy and Bandit typically maintained a regular work routine.  They worked the night shift from 7 p.m. to 4 a.m.  Upon their return from duty, Bandit would immediately retire to his kennel, where he would eat and then sleep for several hours without being disturbed.  The daytime was Bandit's opportunity for rest and sleep.  Sgt. Lovejoy frequently worked overtime duties where needed, but Bandit did not usually accompany Sgt. Lovejoy in his overtime jobs, although he would occasionally come along when needed.

In the days leading up to the incident, Sgt. Lovejoy worked several shifts in a row because the Chandler Police Department was on sustained alert for a serial rapist that had been targeting local residents.  On the morning of August 11, 2007, he had an overtime assignment.  Knowing that he might be called at any moment to help with the serial rapist investigation, he drove his SUV and brought Bandit with him to his assignment.  When his shift ended, he placed Bandit in his kennel in the back of the SUV, and Bandit immediately fell asleep.  At this point, Sgt. Lovejoy had slept only six and one-half hours in the previous fifty-one hours.

On his way home, Sgt. Lovejoy learned that his oldest son had been involved in a minor car accident and needed his immediate help.  Shortly afterward, Sgt. Lovejoy's wife, Carolynn, called him in tears and told him that she was having a personal crisis at work.  At home, both of Sgt. Lovejoy's daughters needed his attention, one to be driven to a friend's house and the other to look for a new pet at a local shelter.  After attending to

the scene of his son's accident, running his daughters on their errands, and stopping into his wife's work to check on her, Sgt. Lovejoy went home and took a brief nap. When his wife arrived, the two went out for dinner.

Upon returning from dinner with his wife, Sgt. Lovejoy went to his SUV to grab his gear. As soon as he opened the door, he noticed a strange smell in the vehicle. He went to the back of the vehicle and realized that Bandit had never come out of the SUV. Bandit had remained in the SUV all day and had died from heat exhaustion.

Sgt. Lovejoy was distraught. He immediately called a fellow Chandler Police Officer, Ron Emary, to help him report the incident. Officer Emary noted that Sgt. Lovejoy was so disturbed that he was babbling on the phone. When Officer Emary arrived at Sgt. Lovejoy's home, he found the entire family outside weeping.

Sgt. Lovejoy and Officer Emary then contacted their supervisor, Commander Gaylord, who immediately drove to Sgt. Lovejoy's residence. Commander Gaylord photographed Bandit and began cleaning up the scene. Commander Gaylord performed a thorough initial investigation. The following Monday morning, the Chandler Police Department issued a statement to the public, explaining that there would only be an internal investigation to determine whether any department policies had been violated and not a criminal investigation.

Because Sgt. Lovejoy's residence sat on an unincorporated island, Sheriff Joseph Arpaio and the Maricopa County Sheriff's Office ("MCSO") had jurisdiction. Within days, Sheriff Arpaio held a press conference to announce that he would be launching a criminal investigation into Sgt. Lovejoy's actions. Although there was no evidence or reason to believe that Sgt. Lovejoy intended to harm Bandit, did not care for Bandit, or sought to hurt or abuse Bandit, Sheriff Arpaio launched a high profile investigation of Sgt. Lovejoy.

For nearly a month, the MCSO interviewed witnesses and collected evidence. In September 2007, unbeknownst to Sgt. Lovejoy, Sheriff Arpaio scheduled a press conference to publicly announce Sgt. Lovejoy's arrest before the arrest took place. To get Sgt. Lovejoy to come to the station in time for the press conference, an MCSO detective asked Sgt. Lovejoy to meet with him. Sgt. Lovejoy offered to meet the detective after his shift, but the detective demanded they meet sooner. When Sgt. Lovejoy questioned the urgency, the detective admitted that it was because the MCSO was going to arrest him under the animal abuse statute.

Sgt. Lovejoy eventually agreed to meet the detective voluntarily, but encountered a delay. The detective's supervisor, Sgt. Summers, then called Sgt. Lovejoy directly and demanded to know why he had been delayed. He also told Sgt. Lovejoy that he had spoken with Sgt. Lovejoy's lawyer and that the lawyer said that "it was ok" for Sgt. Lovejoy to speak with MCSO detectives. Sgt. Lovejoy's lawyer, however, never spoke with MCSO officers and never gave them permission to speak with Sgt. Lovejoy. Sgt. Summers then told Sgt. Lovejoy not to notify his "command staff" and to simply come alone to the police station to meet Sgt. Summers.

Sheriff Arpaio and the MCSO would later tell the public that Sgt. Lovejoy was "behind bars" and that he could be charged with a felony. Neither were true. At the press conference, Sheriff Arpaio touted himself as tough on crime and announced that the MCSO's investigation had found that Sgt. Lovejoy had broken the law by recklessly leaving his dog in a police vehicle for thirteen hours.

Sgt. Lovejoy was eventually taken to an East Mesa jail, where he was processed, booked, and taken for an initial appearance before a judge on animal cruelty charges. The judge denied the MCSO's request for bail and released Sgt. Lovejoy. Several members of the law enforcement community spoke out against the arrest, calling it ridiculous.

In order to validate the high profile and highly controversial investigation and arrest of Sgt. Lovejoy, Sheriff Arpaio pressured the Maricopa County Attorney's Office ("MCAO") to prosecute the case. With pressure mounting from Sheriff Arpaio, the MCAO filed a criminal complaint. The MCAO attorney that was working on the case, Anthony Church, believed that there was no basis for prosecuting Sgt. Lovejoy due to a complete lack of evidence that Sgt. Lovejoy intended to harm Bandit. Church conveyed this formally, in writing, to his MCAO superiors, questioning whether or not the MCAO had an ethical basis to proceed with a prosecution that lacked probable cause. However, because he believed that Sheriff Arpaio would never allow the MCAO to drop the case, he worked behind the scenes with Sgt. Lovejoy's criminal attorney, Robert Kavanagh, to obtain dismissal of the case. In April 2008, Church and Kavanagh jointly drafted a motion to dismiss and a stipulated statement of facts, which effectively admitted that there was no evidence of the intent required by the animal abuse statute. Church agreed to not oppose the motion strongly.

When Sheriff Arpaio learned of Church's involvement he ordered the MCAO to change course. Church was removed from the case and replaced with Lisa Aubuchon, who aggressively fought the motion and urged the court to deny it, promising to produce evidence showing that Sgt. Lovejoy acted with the requisite intent, even though she knew that there was no such evidence because she was on the panel that reviewed Church's written concerns. On August 15, 2009, the case was tried in the San Tan Justice Court. The presiding justice of the peace promptly acquitted Sgt. Lovejoy and noted that the prosecution had not produced a shred of evidence to show that Sgt. Lovejoy's conduct was reckless.

Sheriff Arpaio had never before arrested a law enforcement officer in connection with the death of a police dog, even though at least three other dogs had died under unusual circumstances while in the care of Sheriff Arpaio's deputies. The first dog died

trying to escape from a chain-linked kennel in his handler's home. The second dog was found dead in his kennel in the back yard of his handler's residence on a hot August evening. The veterinarian concluded that the dog had died from heat exhaustion. The third dog died from complications of Valley Fever, apparently due to not having received needed medication for nine months. None of Sheriff Arpaio's own deputies were ever criminally investigated, arrested, or prosecuted, even though the MCSO detective in charge of investigating animal deaths admitted that all of the deaths were suspicious.

## II.    Rule 12(b)(6) Standard

In considering a motion to dismiss, the factual allegations of the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Rhodes v. Robinson*, 408 F.3d 559, 563 n.1 (9th Cir. 2005). A complaint must state a claim for relief that is plausible and that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

## III.    Collateral Estoppel

Defendants argue that Sgt. Lovejoy cannot contest whether there was probable cause to arrest him because that issue was already litigated and decided in a prior state proceeding. Federal courts employ the rules of the state that rendered the prior judgment to determine its preclusive effect. *Jones v. Bates*, 127 F.3d 839, 848 (9th Cir. 1997). In Arizona, issue preclusion applies if: (1) the issue was actually litigated in a previous proceeding; (2) the parties had a full and fair opportunity and the motivation to litigate the issue; (3) there was a valid and final decision on the merits; (4) resolution of the issue was essential to the decision; and (5) there was a common identity of the parties. *Campbell v. Szl Props.*, 204 Ariz. 221, 223, 62 P.3d 966, 968 (2003). The party asserting estoppel bears the burden of pleading and proving that the issue cannot be relitigated. *Hernandez*

*v. City of Los Angeles,* 624 F.2d 935, 937 (9th Cir. 1980).

Sgt. Lovejoy was charged by means of a Uniform Traffic Ticket and Complaint in the San Tan Justice Court for violating Arizona's animal cruelty statute. A person commits cruelty to animals if he "intentionally, knowingly, or recklessly leaves an animal unattended and confined in a motor vehicle and physical injury to or death of the animal is likely to result." A.R.S. § 13-2910A(7). A violation of A.R.S. 13-2910A(7) is a class 1 misdemeanor. A.R.S. § 13-2910G.

In state court, Sgt. Lovejoy moved to dismiss pursuant to Ariz. R. Crim. P. 16.6(b), which allows a defendant to test the sufficiency of an indictment, information, or complaint. A court considering a Rule 16.6(b) motion only has authority to decide whether the indictment "informs the defendant of the essential elements of the charges; is sufficiently definite so that the defendant can prepare to meet the charges; and protects the defendant from subsequent prosecution for the same offense." *Arizona v. Rickard-Hughes*, 182 Ariz. 273, 275, 895 P.2d 1036, 1038 (Ct. App. 1995). The determination of legal sufficiency does not "categorically exclude challenges that involve application of law to facts." *Chronis v. Steinle*, 220 Ariz. 559, 561, 208 P.3d 210, 212 (2009). However, in a Rule 16.6(b) challenge, the court cannot weigh the evidence against the defendant. *See Rickard-Hughes,* 182 Ariz. at 275, 895 P.2d at 1038 ("Weighing the evidence before trial is not appropriate."); *Mejak v. Granville*, 212 Ariz. 555, 556, 136 P.3d 874, 875 (Ct. App. 2006) ("If a defendant can admit to all the allegations charged in the indictment and still not have committed a crime, then the indictment is insufficient as a matter of law.").

Sgt. Lovejoy's motion was titled "Motion to Dismiss Complaint Based on Lack of Probable Cause," and it argued that the evidence failed to establish that he had acted with the state of mind required for a conviction under the animal cruelty statute. The parties

argued the motion, but no witnesses were called and no evidence was presented. The justice of the peace who heard the motion denied it in a minute entry that summarily stated: "On April 8, 2008, Counsel for Defendant, Thomas Lovejoy, filed [a] motion to dismiss. Motion to dismiss is denied." The matter then proceeded to a bench trial in which Sgt. Lovejoy was acquitted.

Although the parties presented probable cause as the issue to be decided in Sgt. Lovejoy's Rule 16.6(b) motion, the Arizona Rules of Criminal Procedure do not authorize the court to make that determination in a misdemeanor case. Arizona authorizes a pre-trial testing of the sufficiency of the state's evidence only in felony cases. Ariz. Const. Art. 2 § 30; Ariz. R. Crim. P. 5.3(a). *Chronis* is not to the contrary. *See Chronis*, 220 Ariz. 559, 208 P.3d 210. There, the Arizona Supreme Court construed a particular rule adopted in 2002 for the explicit purpose of giving a right to a probable cause hearing on aggravating factors alleged in a capital prosecution. *Id.* at 561-63, 208 P.3d at 212-14. However, the rule was badly drafted and did not say what the rulemaking petition stated it was supposed to accomplish. *Id.* The Supreme Court interpreted the rule to give effect to the plain purpose of the rule petition, notwithstanding the bad drafting. *Id.* Nothing in *Chronis* comes close to overturning the longstanding Arizona rule that misdemeanors are not open to pre-trial testing of the sufficiency of the state's evidence.

Taking the complaint at face value, a defense attorney and a conscience-burdened prosecutor made up a procedure to force the dismissal of a case the prosecutor's supervisors would not drop on their own. But a procedure that the law does not sanction does not have preclusive effect. If the justice of the peace had purported to find probable cause, it would have no preclusive effect because he had no authority to make such a finding. In any event, the state court's one line order does not explain why the motion was denied. The most likely explanation is that the court understood the motion was improper, because the court only had authority to decide whether the indictment was

legally sufficient. The court did not make any finding of probable cause. Defendants therefore cannot establish that Sgt. Lovejoy fully and fairly litigated the issue of probable cause, that there was a valid and final decision on the merits, or that resolution of the issue was essential to the decision, as required by Arizona's issue preclusion rules. Sgt. Lovejoy is therefore not precluded from litigating the issue of probable cause.

## IV. Qualified Immunity For Fourth Amendment Violation

Sheriff Arpaio asserts that he is entitled to qualified immunity with respect to Sgt. Lovejoy's Fourth Amendment false arrest claim. To defeat qualified immunity, the facts, viewed in the light most favorable to the plaintiff, must establish that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The constitutional right must be "clearly established in light of the specific context of the case." *al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir. 2009). The court may exercise its discretion in deciding which of the two prongs of the qualified immunity analysis should be considered first. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

### A. Constitutional Violation

The Fourth Amendment requires probable cause for an arrest. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964). A plaintiff states a Fourth Amendment violation claim if the allegations in the complaint allow the reasonable inference that there was no probable cause to arrest. *See Iqbal*, 129 S. Ct. at 1949; *see also Mendocino Envtl. Ctr. v. Mendocino County*, 14 F.3d 457, 462 (9th Cir. 1994) (holding that plaintiff stated a claim when the factual assertions alleged in the complaint accepted as true established that a reasonable officer would have known that plaintiff did not have the requisite state of mind to commit the alleged crime).

**1.      Criminal Recklessness**

An arrest is unlawful unless probable cause exists under a specific criminal statute. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1207 (9th Cir. 2008). A person violates Arizona's animal cruelty if he "recklessly leaves an animal unattended and confined in a motor vehicle and physical injury to or death of the animal is likely to result." A.R.S § 13-2910. Recklessness requires that the person be "aware of and consciously disregard a substantial and unjustifiable risk that the result will occur or that the circumstance exists," and that the risk be "of such nature and degree that disregard of such risk constitutes a gross deviation from the standard that a reasonable person would observe in the situation." A.R.S. § 13-105. In contrast, criminal negligence, which is related to criminal recklessness in requiring a "substantial" risk and a "gross" deviation from applicable norms, requires only "a failure to perceive a risk, as compared to the recklessness requirement of an awareness and conscious disregard of the risk." *In re William G.*, 192 Ariz. 208, 213, 963 P.2d 287, 291 n.1 (Ct. App. 1997). A person's mental state is generally ascertained by inference from all of the relevant surrounding circumstances. *Id*. While there are no Arizona cases on point, several out-of-state cases illustrate the circumstances that support recklessness in failing to remove a child from a vehicle.[1]

Recklessness has been found from prior neglect of a child and knowledge that the child remained in the vehicle. *Illinois v. Kozlow*, 301 Ill. App. 3d 1, 3-5, 703 N.E.2d 424, 226-27 (Ct. App. 1998), found enough evidence to convict the mother of a three-month-

---

[1]These are cases of sufficiency of the evidence to convict, and therefore the evidence has been construed in the light most favorable to the prosecution. *See Illinois v. Kozlow*, 301 Ill. App. 3d 1, 5 (Ct. App. 1998); *Arteaga v. Texas*, No. 01-00-00482-CR, 2002 WL 1935268, 2002 Tex. App. LEXIS 6096 (Ct. App. Aug. 22, 2002); *Tennessee v. Every*, No. W2005-00547-CCA-R3-CD, 2007 WL 1860789, at *1-3, 2007 Tenn. Crim. App. LEXIS 512, at *6-9 (Crim. App. June 28, 2007). Here, in contrast, the facts, though not the legal conclusions, should be construed and all reasonable inferences should be drawn in favor of Sgt. Lovejoy.

old baby of involuntary manslaughter, which requires a mental state of recklessness, when she left her child in a car for four hours on a summer morning and the child died from exposure. *Id.* at 2, 703 N.E.2d at 426. The mother claimed that she had forgotten the baby in the car when she went inside her house to take a nap. *Id.* at 3, 703 N.E.2d at 427. However, the mother was in the habit of leaving her baby in the car for up to twenty minutes while she visited friends and ran errands. *Id.* at 4-5, 703 N.E.2d at 427. In addition, there was evidence that the mother had left the child in the car in an effort to get uninterrupted sleep. *Id.* at 6, 703 N.E.2d at 428. There was a "conscious disregard" of a substantial risk to the child because the mother knew the child had been left in the car and disregarded the risk that the conditions in the car would lead to the child's death. *Id.* at 5-7, 703 N.E.2d at 427-28.

A person is also reckless in creating the conditions, such as by drinking and driving with little sleep, that lead to the child being placed at risk. *Arteaga v. Texas*, No. 01-00-00482-CR, 2002 WL 1935268, at *1-4, 2002 Tex. App. LEXIS 6096, at *3, *8-10 (Ct. App. Aug. 22, 2002). *Arteaga* found enough evidence to convict the mother of an eight-month old baby of reckless injury to a child when the mother forgot her baby in a car overnight and the baby died of exposure. *Id.* The mother, her husband, their two-year-old daughter, and their eight-month-old son, were visiting friends the night before the incident. *Id.* at *1-2, 2002 Tex. App. LEXIS 6096, at *1-3. The parents drank and were intoxicated. *Id.* At one point in the evening, the mother offered to give away her baby to her friends. *Id.* at *1, 2002 Tex. App. LEXIS 6096, at *2-3. The mother's friends asked the family to stay overnight; however, after sleeping for only a short while, the mother decided to drive home despite her husband's warning not to do so. *Id.* at *1-2, 2002 Tex. App. LEXIS 6096, at *2-4. While driving, the mother became drowsy and stopped at a gas station where she asked a limousine driver to take her and "the babies" home. *Id.* The mother took her daughter but left her son in a car seat in the back seat of

the car. *Id*. at *1, 2002 Tex. App. LEXIS 6096, at *4. Both parents claimed that they did not remember placing their eight-month-old son in the car. *Id*. at *2, 2002 Tex. App. LEXIS 6096, at *3. The mother was found to be reckless because it was unlikely that she was unaware that the child was in the car, and leaving an eight-month-old child in a car consciously disregards a substantial risk of harm. *Id*. at *3-4, 2002 Tex. App. LEXIS 6096, at *9-10.

In both cases there was strong circumstantial evidence of recklessness. First, there was evidence that the children had been previously neglected or were unwanted. In *Kozlow*, the mother often left her child in the car while she attended to other matters, and in *Arteaga*, the mother offered to give away her son to her friends the night before the child was left in the car. Second, there was evidence that the defendants wilfully created the conditions that led to the children being placed at risk of serious harm. In *Kozlow,* the mother knew she was leaving her child in the car on a hot morning in order to take a nap. In *Arteaga*, the mother drove with her children even though she had been drinking heavily, had slept very little, and was advised not to drive home. Third, there was reason to believe that the mothers had not sincerely "forgotten" their children. In *Kozlow*, the mother left the child in the car in order to take a nap. In *Arteaga*, it was unlikely that the mother did not know that the child had been left in the car because the child was in the back seat, the mother removed one child and not the other from the car, and the mother had referred to both children in conversation with the limousine driver when she asked him whether he could give her and "the babies a ride home." Finally, both cases involved very young children. Because young children require constant care and attention, adults tasked with caring for them are expected to be vigilant as to their well-being and whereabouts.

Recklessness has also been found where a specific directive to take precautions in a high risk situation was ignored. *Tennessee v. Every*, No. W2005-00547-CCA-R3-CD,

2007 WL 1860789, at *1-3, 2007 Tenn. Crim. App. LEXIS 512, at *6-9 (Crim. App. June 28, 2007). In *Every*, a daycare worker was found to be reckless when she failed to inspect the van used to transport children to the day care center and a two-year-old child was left in the van and died. *Id*. The day care worker had been specifically instructed to personally walk the length of the van and to check above and below the seats for children after the van arrived at the day care center to ensure that no children remained in the van. *Id*. at *1-2, 2007 Tenn. Crim. App. LEXIS 512, at *2-4. The day care worker did not do so, relying instead upon the van attendant's statement that the van was empty. *Id*. The day care worker consciously disregarded the substantial risk that a child would be left behind in the van by failing to personally perform an inspection. *Id.* at *3, 2007 Tenn. Crim. App. LEXIS 512, at *6-9.

*Every* is in line with *Kozlow* and *Arteaga*. The day care worker was entrusted with the care of very young children and it was reasonable to expect a heightened awareness to their safety. It would be relatively easy to overlook a single child in a van loaded with children, and thus there was a significant risk that a child could be left behind when the van was unloaded. A specific policy was developed to eliminate that risk–the day care worker was required to walk the van up and down to ensure that no child had been forgotten. In deciding to ignore that directive, the day care worker disregarded the substantial risk that a child would be left in the van.

### 2. Probable Cause

The test for probable cause is whether "officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Torres*, 548 F.3d at 1206 (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)). Conclusive evidence of guilt is not necessary, but "[m]ere suspicion, common rumor, or even strong

- 13 -

reason to suspect are not enough." *Id.* To state a claim, Sgt. Lovejoy's allegations must give rise to a reasonable inference that Sheriff Arpaio was aware of facts that would lead a reasonable person to believe that Sgt. Lovejoy was not reckless.

Because the MCSO conducted a month-long investigation into the circumstances surrounding Bandit's death and there was a lot of public attention to the case before and after Sgt. Lovejoy was arrested, it must be taken that Sheriff Arpaio knew, as Sgt. Lovejoy has alleged, that (1) Sgt. Lovejoy was an animal lover and took very good care of Bandit during the four years prior to the incident; (2) Sgt. Lovejoy was operating under the stress of family pressures and with very little sleep on the day of the incident as a result of being called upon to perform overtime work by the Chandler Police Department; (3) Bandit did not usually accompany Sgt. Lovejoy on overtime assignments; (4) Sgt. Lovejoy took Bandit on his last overtime assignment in case he was called to help with the serial rapist investigation; (5) Sgt. Lovejoy was not at fault for the circumstances that led to him being sleep deprived and to have to deviate from his usual routine; (6) Bandit was asleep in his kennel in the back of the SUV when Sgt. Lovejoy reached his home; and (7) Sgt. Lovejoy was genuinely surprised when he discovered Bandit dead in the SUV to the point of weeping and babbling. Accepting the allegations in the complaint as true and excluding other possible circumstances that may have been known to Sheriff Arpaio but not alleged in the complaint, there was no reason for Sheriff Arpaio to disbelieve this account of the incident.

A reasonable person with knowledge of these facts and only these facts would not have believed that Sgt. Lovejoy was reckless by "consciously disregarding" the risk to Bandit. There is no allegation that Sgt. Lovejoy ever neglected Bandit. To the contrary, the allegation is that Sgt. Lovejoy was an animal lover who lavished upon Bandit, rescued dogs, and volunteered to help his police department raise money to purchase new dogs. There is no allegation that Sgt. Lovejoy was intoxicated or that he otherwise created the

- 14 -

conditions that led to Bandit being at risk.  Sgt. Lovejoy was sleep deprived and stressed, but only because he had been called to work overtime by the Chandler Police Department and because of external family pressures.  Bandit was not in the backseat of a car where he could easily be spotted--he was in a kennel, asleep, in the rear of the SUV.  The allegations in the complaint indicate that Sgt. Lovejoy sincerely forgot that Bandit was in the SUV for reasons not caused by his own prior recklessness or fault.  A person who fails to perceive a risk, even when the failure to do so is a "gross" deviation from applicable norms, can only be negligent, not reckless.  *See In re William G.*, 192 Ariz. 208, 213, 963 P.2d 287, 291 n.1 (Ct. App. 1997).

Finally, although Bandit was dependent on Sgt. Lovejoy to remove him from the car, unlike an infant, Bandit did not require constant supervision.  Bandit usually spent most of his day in Sgt. Lovejoy's yard, with Sgt. Lovejoy's other dogs.  The level of vigilance expected of a person who cares for an adult animal is less than that expected of someone caring for an infant.  Viewed in the light most favorable to Sgt. Lovejoy, the complaint pleads enough facts to take Sgt. Lovejoy's claim that he was arrested without probable cause "across the line from the conceivable to the plausible."  *See Iqbal*, 129 S. Ct. at 1951.

### B.    Immunity

Even though, assuming the allegations in the complaint are true, Sgt. Lovejoy's arrest was without probable cause, Sheriff Arpaio cannot be personally liable unless his conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable officer would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is an objective inquiry–whether an officer subjectively believed that he had probable cause to arrest is irrelevant.  *See Anderson v. Creighton*, 483 U.S. 635, 641(1987); *see also Mendocino Envtl. Ctr.,* 14 F.3d at 462 (explaining that it is the officer's knowledge

- 15 -

that is relevant, since the objective qualified immunity analysis is focused on a reasonable officer confronted with the facts and circumstances actually known to the officer).

To defeat qualified immunity, the unlawfulness of Sheriff Arpaio's actions must have been apparent in light of pre-existing law. While there is no other case analyzing whether a person is reckless in the circumstances presented here, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *See Anderson,* 483 U.S. at 640. "The relevant dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005) (emphasis in original); *see also Anderson,* 483 U.S. at 640-41 (explaining that it does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause violate the Fourth Amendment that the officer's search was objectively unreasonable, but that the determination requires an examination of the information possessed by the officer).

The Ninth Circuit recognizes that an assertion of qualified immunity at the motion to dismiss stage puts the court in the difficult position of deciding far-reaching constitutional questions on a nonexistent factual record. *al-Kidd,* 580 F.3d at 965. However, looking only to the circumstances alleged in the complaint, they clearly state that Sgt. Lovejoy was not reckless in Bandit's death. Sheriff Arpaio is said to have been aware of this. Sheriff Arpaio was not called upon to make a quick decision on the spot regarding Sgt. Lovejoy's culpability–the MCSO and the Sheriff had conducted a thorough investigation for nearly a month before arresting Sgt. Lovejoy in conjunction with a scheduled press conference. Moreover, it is clearly established, and Sheriff Arpaio should have known, that in the absence of probable cause to believe that Sgt. Lovejoy was reckless, Sgt. Lovejoy's arrest was unlawful. It may turn out that Sgt. Lovejoy's allegations fall short on the evidence, or that Sheriff Arpaio was not aware of the

circumstances surrounding Bandit's death; however, at this stage of the proceedings the Court is required to accept Sgt. Lovejoy's factual allegations as true and to draw all reasonable factual inferences in Sgt. Lovejoy's favor. Sheriff Arpaio is not entitled to qualified immunity now. He may soon present his defense again on summary judgment.

**V.      Equal Protection**

Sgt. Lovejoy alleges that Sheriff Arpaio violated his equal protection rights by selectively arresting and prosecuting him. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Where state action does not implicate a fundamental right or a suspect classification, the plaintiff may nevertheless state an equal protection claim by demonstrating that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004), *overruled on other grounds*, *Action Apt. Ass'n v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1025 (9th Cir. 2007).

In any equal protection analysis, it is first necessary to identify the class or group being discriminated against. *Id.* at 945. Sgt. Lovejoy claims that he was singled out from all other police officers, and Sheriff Arpaio's own MCSO officers in particular, whose service dogs died under their care. Sgt. Lovejoy alleges that at least three other police dogs died under suspicious circumstances, but that their handlers were never investigated, disciplined, or prosecuted.

The allegations in the complaint, however, do not establish that Sgt. Lovejoy was similarly situated to the other officers who were not investigated. Sgt. Lovejoy was

prosecuted under A.R.S. § 13-2910A(7), which criminalizes "intentionally, knowingly, or recklessly leav[ing] an animal unattended and confined in a motor vehicle" when "physical injury to or death of the animal is likely to result." Sgt. Lovejoy does not allege that any other dog died as a result of being left unattended in a motor vehicle. Instead, Sgt. Lovejoy alleges that one dog died because he did not receive needed medication, that another dog died trying to escape from a chain-linked kennel, and that a third dog died from heat exhaustion in his kennel. The circumstances in which those dogs died are different from those surrounding Bandit's death. Sgt. Lovejoy was therefore not "similarly situated" to the other officers who were not investigated. *See Squaw Valley Dev. Co.,* 375 F.3d at 945 (ski resort not similarly situated to other ski resorts when it failed to show that others were of comparable size, had a comparable history of non-compliance, engaged in a comparable level of activity, or had a comparable history of administrative action being ineffective).

A plaintiff may nevertheless state an equal protection claim based upon selective enforcement of the law if he can show that the defendant's alleged rational basis is a pretext for an impermissible motive. *Lazy Y Ranch LTD*, 546 F.3d at 592. The class of one theory is unusual because "the plaintiff in a 'class of one' case does not allege that the defendants discriminate against a *group* with whom she shares characteristics, but rather that the defendants simply harbor animus against her *in particular* and therefore treated her arbitrarily." *Id.* at 592 (emphasis in original).

While there is no Ninth Circuit precedent that directly addresses whether a plaintiff may bring a class of one claim against police officers, the Seventh Circuit has concluded that such a cause of action exists when a plaintiff claims that the police have inflicted unequal treatment for no reason other than malice. *Hanes v. Zurick*, 578 F.3d 491, 496 (7th Cir. 2009). Sgt. Lovejoy has alleged that Sheriff Arpaio specifically targeted Sgt. Lovejoy for arrest and prosecution for reasons wholly unrelated to any legitimate state

objective, that is, for the sole purpose of garnering publicity. In light of *Hanes* and in the absence of any contrary authority cited by Defendants, the Court cannot agree at this stage of the litigation that Sgt. Lovejoy's class of one equal protection claim fails. A different conclusion may be warranted upon consideration of a properly supported motion for summary judgment and with the benefit of a fully developed record.

Finally, Defendants contend that Sgt. Lovejoy cannot maintain a class of one claim because Sgt. Lovejoy's arrest was based on probable cause, and the existence of probable cause would defeat a class of one selective enforcement claim. *See Jordan v. Oregon Dept of Human Servs.*, No. 07-940-HA, 2009 WL 2184539, at \*5, 2009 U.S. Dist. LEXIS 61960, at \*15-16 (D. Or. July 21, 2009) ("However, if defendants can prove probable cause existed for the underlying criminal prosecution, then this evidence suggests that the prosecution would have occurred regardless of the retaliatory motive."); *cf. Hartman v. Moore*, 547 U.S. 250, 257-66 (2006) (holding that plaintiff must show lack of probable cause in a Bivens action against criminal investigators for inducing prosecution in retaliation for speech). The Court, however, has found that the complaint sufficiently alleges lack of probable cause. Therefore, Defendants' contention fails as of this early stage of the proceeding.

## VI. Municipal Liability

Sgt. Lovejoy sued Sheriff Arpaio in his official capacity, and a suit against a municipal officer in his official capacity is equivalent to a suit against the municipality. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Under *Monell*, municipal liability may be based on: an expressly adopted official policy; a longstanding practice or custom; or the decision of a person with final policymaking authority. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). Sgt. Lovejoy claims that he is entitled to relief under the second and third *Monell* prongs.

## A.    Custom or Practice

Sgt. Lovejoy contends that there is a longstanding practice or custom in Maricopa County of targeting, arresting, and prosecuting individuals without probable cause. However, the complaint only describes political exploitation by Sheriff Arpaio of Sgt. Lovejoy for publicity.  The complaint does not allege a longstanding municipal custom or practice of arresting people without probable cause.  Sgt. Lovejoy therefore has failed to state a claim under the second *Monell* prong.  At oral argument Plaintiffs requested leave to amend the complaint to include such allegations.  Plaintiffs will be given leave to add such allegations; but in light of the Court's alternative conclusion that municipal liability is established because Sheriff Arpaio is an official policymaker for Maricopa County, it is a matter of Plaintiffs' choice whether to add the duplicative ground of a longstanding practice of arresting and prosecuting persons without probable cause.

## B.    Final Policymaker

A municipality may be held liable under § 1983 when the person who committed the violation was an official with final policymaking authority or when such an official ratified a subordinate's unconstitutional decision or action and the basis for it.  *Clouthier v. County of Contra Costa*, __ F.3d __, 2010 WL 114958, at *14, 2010 U.S. App. LEXIS 884, at*42-43 (9th Cir. Jan. 14, 2009).  "It does not matter that the final policymaker may have subjected only one person to only one constitutional violation."  *Lytle*, 382 F.3d at 983.  "A municipality can be liable for an isolated constitutional violation when the person causing the violation has final policymaking authority."  *Id.* (quoting *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999)); *see also Larez v. Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) ("To the extent that the terms 'policy' and 'custom' imply something beyond a single decision, official liability may also be imposed where a first-time decision to adopt a particular course of action is directed by a governmentally authorized

decisionmaker.")

Sgt. Lovejoy contends that Sheriff Arpaio is a final policymaker for Maricopa County and in this capacity violated Sgt. Lovejoy's civil rights. Identifying a policy-making official is a question of law for the court to decide by reference to state law, not one of fact to be submitted to the jury. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). "When determining whether an individual has final policymaking authority, [the court] ask[s] whether he or she has authority '*in a particular area or on a particular issue.*'" *Lytle*, 382 F.3d at 983 (emphasis in original) (quoting *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997)).

Sheriff Arpaio is a final policymaker for Maricopa County in the context of criminal law enforcement. A.R.S. § 11-441(A)(2) provides that the Sheriff shall "arrest and take before a magistrate for examination all persons who attempt to commit or who have committed a public offense." "The purpose of this duty is the prompt and orderly administration of criminal justice, including the Sheriff's discretionary investigatory determination of when enough evidence has been obtained to make an arrest." *De Jesus Ortega Melendres v. Arpaio*, 598 F. Supp. 2d 1025, 1039 (D. Ariz. 2009). The Sheriff can call upon others to assist him in the execution of these duties. *See* A.R.S. 11-441(B) ("The sheriff may in the execution of [those] duties . . . command the aid of as many inhabitants in the county as the sheriff deems necessary.") The Sheriff also has fiscal independence. Maricopa County must pay the actual and necessary expenses of the Sheriff. A.R.S. § 11-444 ("The sheriff shall be allowed actual and necessary expenses incurred by the sheriff in pursuit of criminals.") No one above the Sheriff has the authority to investigate crimes and arrest individuals. Therefore, the Sheriff has final policymaking authority in the context of criminal law enforcement. *See De Jesus Ortega Melendres,* 598 F. Supp. 2d at 1038-39 (holding that the Sheriff is the final policymaker with respect to criminal investigations); *Guillory v. Greenlee County*, No. CV 05-352

TUC DCB, 2006 WL 2816600, at *4, 2006 U.S. Dist. LEXIS 71926, at *12 (D. Ariz. Sept. 28, 2006) (same); *Flanders v. Maricopa County*, 203 Ariz. 368, 378, 54 P.3d 837, 847 (Ct. App. 2002) (holding county liable because the sheriff is a county officer whose duties regarding jail operations are fixed by law).

Because Sheriff Arpaio is a final policymaker for Maricopa County, his acts "surely represent[] an act of official government 'policy.'" *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1027 (9th Cir. 2008) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). "For purposes of *Monell* liability, the term 'policy' includes. . . . 'a course of action tailored to a particular situation and not intended to control decisions in later situations.'" *Lytle*, 382 F.3d at 983 (quoting *Pembaur*, 475 U.S. at 481). A policy is "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (quoting *Pembaur*, 475 U.S. at 483-84)). Sgt. Lovejoy has alleged Sheriff Arpaio made a deliberate choice to engage in conduct that violated his civil rights. Sgt. Lovejoy has therefore stated a claim for municipal liability under the third *Monell* prong. *See Harper*, 533 F.3d at 1025 (police chief is final policymaker for City of Los Angeles, rendering City liable for police chief's "decision that deprived plaintiffs of their constitutional rights").

## VII.    Malicious Prosecution

Sgt. Lovejoy asserts malicious prosecution claims against Sheriff Arpaio under § 1983 and Arizona law. "[T]o prevail on a § 1983 claim of malicious prosecution, a plaintiff must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying him [a specific constitutional right.]" *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004)

- 22 -

(quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)). Under Arizona law, "the elements of a malicious prosecution claim are: (1) a criminal prosecution, (2) that terminates in favor of the plaintiff, (3) with the defendants as prosecutors, (4) actuated by malice, (5) without probable cause, and (6) causing damages." *Slade v. City of Phoenix*, 112 Ariz. 298, 300, 541 P.2d 550, 552 (1975). "Malicious prosecution actions are not limited to suits against prosecutors but may be brought, as here, against other persons who have wrongfully caused the charges to be filed." *Awabdy*, 368 F.3d at 1066.

To state a claim for malicious prosecution, Sgt. Lovejoy must have alleged that a state or local official improperly exerted pressure, knowingly provided misinformation to the prosecutor, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings. *Lacy v. County of Maricopa,* 631 F. Supp. 2d 1183, 1195 (D. Ariz. 2008). Sheriff Arpaio contends that the allegations in the complaint are insufficient because they merely establish that Sheriff Arpaio urged the county attorney to prosecute Sgt. Lovejoy, and that this does not rise to the level of impropriety required to rebut the presumption of prosecutorial independence.

The filing of a criminal complaint immunizes police officers from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an arrest exists at that time. *Harper*, 533 F.3d at 1027. "A § 1983 plaintiff may rebut this presumption, however, by showing that the district attorney was pressured or caused by the investigating officers to act contrary to his independent judgment." *Id.* at 1028. The presumption of prosecutorial independence does not protect investigative officers if they interfered with the prosecutor's judgment by omitting relevant information or by pressuring the prosecutor to file charges. *Id.*

- 23 -

In *Harper*, the police exerted improper pressure on the district attorney by "hounding" him to file criminal charges against several police officers in a high profile corruption case that generated intense media scrutiny. *Id*. When the district attorney in *Harper* expressed caution about initiating a prosecution without a thorough investigation, the chief of the police department told him, "I don't care. Let's get the case behind us. If we prosecute the case, even if you lose, it's over." *Id*. at 1028. In addition, there was evidence that the district attorney was not independent but had worked "hand-in-hand" with the police throughout the investigation. *Id*. at 1027.

Likewise, Sgt. Lovejoy alleged that Sheriff Arpaio pressured the county attorney's office to initiate criminal proceedings against him without probable cause. The prosecutor initially assigned to Sgt. Lovejoy's case conveyed to his superiors in writing that there was a complete lack of evidence of any violation of the animal cruelty statutes and questioned whether the district attorney's office had an ethical basis to proceed with the prosecution. When Sheriff Arpaio learned of this and of the prosecutor's cooperation with Sgt. Lovejoy's defense attorney, Sheriff Arpaio "ordered" the county attorney's office to change course. The county attorney acquiesced and put a new prosecutor, Lisa Aubuchon, on the case. The complaint further alleges that Aubuchon knew that there was no evidence of criminal conduct because Aubuchon was on the panel that reviewed the first prosecutor's written concerns.

There was also ample evidence in *Harper*, and there are numerous allegations here, that investigating officers acted with an improper purpose. For instance, the police in *Harper* planned to arrest the officers publicly and parade them in front of the media. *Id*. at 1020. When the officers learned of this from an article published on the front page of the Los Angeles Times, they arranged to turn themselves in. *Id*. The police department subsequently issued a press release quoting the chief of police stating that "misconduct would not be tolerated." *Id*. The police then pressured the district attorney

to prosecute although he did not have probable cause to do so. *Id.* Sgt. Lovejoy has similarly alleged that Sheriff Arpaio scheduled a press conference before arresting him and attempted to lure him to the sheriff's station so that his arrest and felony prosecution could be announced to the press. The prosecutor first assigned to the case went so far as to cooperate with Sgt. Lovejoy's defense to have the case dismissed because he knew that there was no probable cause. However, his superiors would not have allowed him to drop the case due to Sheriff Arpaio's pressure.

It is possible to infer from these allegations that the prosecution's ultimate decision to file charges was tainted by the pressure exerted by Sheriff Arpaio and that Sheriff Arpaio acted with malice and with the intent to deprive Sgt. Lovejoy of his constitutional rights. *See id.* at 1028. While there is no allegation that Sheriff Arpaio withheld or tampered with evidence, "the presumption of prosecutorial independence protects investigative officers unless the evidence shows that the officers interfered with the prosecutor's judgment by omitting relevant information *or by pressuring the prosecutor to file charges.*" *Id.* (emphasis added). Sgt. Lovejoy has alleged that Sheriff Arpaio pressured the county attorney to bring charges with malice and without probable cause. Further, Sgt. Lovejoy was acquitted of the charges and has alleged damages. Sgt. Lovejoy has therefore stated a claim for malicious prosecution under both § 1983 and Arizona law.

**VIII.  State Law Claim for Abuse of Process**

In Arizona, "one who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it was not designed, is subject to liability to the other for harm caused by the abuse of process." *Nienstedt v. Wetzel*, 133 Ariz. 348, 353, 651 P.2d 876, 881 (Ct. App. 1982). "The elements of an abuse of process claim are '(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of proceedings.'" *Crackel v. Allstate Ins. Co.*, 208 Ariz.

252, 257, 92 P.3d 882, 887 (Ct. App. 2004) (quoting *Nienstedt*, 133 Ariz. at 353, 651 P.2d at 881). "A party can demonstrate the latter element by showing that the process has been used primarily to accomplish a purpose for which the process was not designed." *Id.* (internal quotations omitted). "Process" encompasses the entire range of procedures incident to litigation. *Crackel*, 208 Ariz. at 258, 92 P.3d at 888.

Abuse of process is "a definite act or threat not authorized by the process, or aimed at an objective not legitimate in the course of the process." *Id.* (internal quotations omitted). "There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* "Liability should result only when . . . the utilization of the procedure for the purposes for which it was designed becomes so lacking in justification as to lose its legitimate function as a reasonably justifiable litigation procedure." *Crackel*, 208 Ariz. at 259, 92 P.3d at 889 (internal quotations omitted). Sgt. Lovejoy alleges that Sheriff Arpaio investigated, arrested, and prosecuted him solely to obtain publicity. However, "[a]buse of process . . . is not commencing an action or causing process to issue without justification." *Morn v. City of Phoenix*, 152 Ariz. 164, 167, 730 P.2d 873, 876 (Ct. App. 1986). In fact, "even a pure spite motive is not sufficient where process is used only to accomplish the result for which it was created." *Id.* (quoting Prosser and Keeton on the Law of Torts § 121 at 897 (5th ed. 1984)). Sgt. Lovejoy has alleged that his arrest and prosecution were improper, but he has not alleged that any specific judicial process was employed for a purpose other than for what it was designed. Therefore, Sgt. Lovejoy's abuse of process claim fails.

## IX.     State Law Claim for False Arrest

The statute of limitations for a false imprisonment claim in Arizona is one year from the date that the claim accrues. A.R.S. § 12-541. The claim accrues on the date the plaintiff was arrested. Sgt. Lovejoy was arrested only once, on September 5, 2007, whereas the complaint was filed on August 14, 2009, nearly two years later. Sgt. Lovejoy

does not dispute that their claim for false arrest is time-barred.  Plaintiffs' claim for false arrest is therefore dismissed.

## X.    Maricopa County Sheriff's Office

In Arizona, a government entity may be sued only if the legislature has given the entity the power to be sued.  *See Schwartz v. Superior Court*, 186 Ariz. 617, 619, 925 P.2d 1068, 1070 (Ct. App. 1996).  There is a consensus that Arizona's municipal police departments are non-jural entities.  *Payne v. Arpaio*, No. CV09-1195-+PHX-NVW, 2009 WL 3756679, at *4, 2009 U.S. Dist. LEXIS 110553, at *14 (citing relevant cases). Courts that have found the MCSO to be a non-jural entity have relied primarily on the lack of a statute conferring the power on the MCSO to sue and be sued.  *Id.*  Plaintiffs have indicated that they are willing to concede that MCSO is a non-jural entity and to dismiss MCSO from the suit.  Therefore, MCSO is dismissed from the suit.

## XI.    Carolynn Lovejoy

Carolynn Lovejoy has failed to assert claims against Defendants.  Plaintiffs have sought and will be given leave to amend their complaint to make such allegations.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (doc. #10) is denied, except that Plaintiffs' state law claims for abuse of process and false arrest are dismissed with prejudice.  Plaintiffs are given leave until February 26, 2010, to amend their complaint to add allegations by Carolynn Lovejoy and to add claims against Maricopa County to the extent stated in this order.

/ / /

1    IT IS FURTHER ORDERED that all claims against the Maricopa County Sheriff's

2  Office are dismissed without prejudice for lack of jural status.

3    DATED this 10th day of February, 2010.

4

5    _____

6                   Neil V. Wake
              United States District Judge