**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Thomas Lovejoy and Carolyn Lovejoy, husband and wife, | No. CV09-1912-PHX-NVW |
| Plaintiffs, | **ORDER** |
| vs. | |
| Sheriff Joseph Arpaio and Ava Arpaio, husband and wife, | |
| Defendants. | |

I.     Facts ................................................................................................. 3

    A.     Bandit's Death ........................................................................... 3

    B.     The Investigation ...................................................................... 5

    C.     Lovejoy's Arrest ....................................................................... 8

    D.     Simonson's Interview with Lovejoy's Defense Attorney ................... 11

    E.     The Decision to Take the Case to Trial .............................................. 15

    F.     The Trial ..................................................................................... 19

    G.     The Lovejoys' Alleged Injuries .......................................................... 20

II.     Summary Judgment Standard ................................................................ 20

III.     Admissibility of Certain Evidence ....................................................... 21

IV.     Summary of Arguments ....................................................................... 22

V.     Probable Cause & Qualified Immunity ................................................ 23

    A.     Probable Cause Generally .................................................................. 23

    B.     Effect of Ariz. R. Crim. P. 20 Motion ............................................... 24

    C.     Proper Focus of Probable Cause & Qualified Immunity Inquiries ..... 25

    D.     Lack of Probable Cause & Qualified Immunity .................................. 27

VI.     Arpaio's Alleged Personal Involvement ............................................... 33

    A.     The Decision to Arrest and Charge ..................................................... 33

    B.     The Decision to Continue Prosecuting ............................................... 36

VII.     Municipal Liability ............................................................................. 40

VIII.     Equal Protection ............................................................................... 41

In this action, Chandler Police Sergeant Thomas Lovejoy seeks damages from Maricopa County Sheriff Joseph Arpaio (in his individual and official capacities) for Lovejoy's allegedly unconstitutional arrest and prosecution arising out of the death of Lovejoy's police dog. Sheriff Arpaio has moved for summary judgment, arguing that Lovejoy lacks evidence to connect Arpaio to the arrest and prosecution, and that various legal doctrines shield him from liability in any event. (Doc. 92 *as corrected by* Doc. 94-1.)

On the record before the Court, the arrest and prosecution were obviously unconstitutional, and Lovejoy has enough evidence from which a jury could infer that Arpaio acted to ensure Lovejoy was arrested and prosecuted anyway. Summary judgment will therefore be denied as to the false arrest and malicious prosecution claims. Summary judgment will be granted, however, on Lovejoy's equal protection claim because he has not shown that he was similarly situated to other police officers whose dogs died under their care.

I.     **FACTS**[1]

   A.     **Bandit's Death**

Plaintiff Thomas Lovejoy is a police sergeant employed by the City of Chandler. During the time period relevant to this lawsuit, Lovejoy was the supervising sergeant for the Chandler Police Department's K-9 unit. Lovejoy's K-9 partner was a Belgian Malinois named Bandit. Bandit would ride in a special kennel at the back of Lovejoy's police SUV.

Lovejoy's and Bandit's regular duty shift was from 6:00 p.m. to 4:00 a.m., Monday through Thursday. From Monday, August 6 through Thursday, August 9, 2007, Lovejoy and Bandit worked their regular duty shifts. On Friday, August 10, Lovejoy

---

[1] These facts are undisputed unless attributed to a party. If a factual assertion was objected to for no other reason than immateriality, the Court has deemed that fact undisputed.

worked an extra-duty shift from 8:30 a.m. until about noon.  That night, he had trouble sleeping because he did not feel well.

Around 2:00 a.m. on Saturday, August 11, Lovejoy's lieutenant at the Chandler Police Department awoke Lovejoy with a phone call.  The lieutenant reported a possible sighting of a serial rapist that had recently been terrorizing the Chandler community. Lovejoy's lieutenant asked Lovejoy to report for duty.  Lovejoy agreed, but instead of getting out of bed, he fell back asleep because he was extremely tired.

About an hour later, Lovejoy's lieutenant called again.  Lovejoy then got out of bed, put on his uniform, put Bandit into his police SUV, and began driving toward the scene.  As he drove, he spoke with his lieutenant again by cell phone.  In frustration, the lieutenant told Lovejoy to return home.  Lovejoy did so and placed Bandit in his backyard kennel, but Lovejoy did not go back to sleep because he was upset with himself for falling asleep after his lieutenant's first phone call that morning.  By this time, Lovejoy had slept only about six-and-a-half hours over the previous two days.

Lovejoy volunteered for an extra-duty traffic control shift that morning beginning at 6:00 a.m.  He was not required to bring Bandit with him but he brought Bandit anyway because, he says, he wanted to be prepared if the serial rapist was again spotted. Although the record is somewhat hazy, it appears that Lovejoy and Bandit both remained in the SUV for the entire shift, which ended at 9:00 a.m.  Lovejoy believes that Bandit had fallen asleep in his kennel by this point because daytime was Bandit's usual sleep time.

While driving home, Lovejoy received various cell phone calls and was still talking on his phone when he pulled into his driveway, exited his vehicle, and walked into his house.  Lovejoy did not take Bandit out of the SUV.  For the rest of the day, Lovejoy attended to various family obligations, including helping his stepson with a minor car accident, shopping with one of his daughters, and going out to dinner with his wife.  He used his personal vehicle for all of these tasks.  At about 10:30 that night, he

- 4 -

returned to his police SUV to get it ready for another extra-duty shift, smelled an unusual smell, and discovered Bandit dead in his kennel.

Lovejoy was distraught.  He soon called fellow Chandler Police Officer Ron Emary to help him report the incident, but he could barely do more than babble over the phone.  Emary arrived on the scene soon after, as did Chandler Police Department Commander Joseph Gaylord, who photographed the scene, cleaned up Bandit's kennel, and took Bandit's body to an animal hospital for cremation.

**B.      The Investigation**

On Tuesday, August 14, the Maricopa County Sheriff's Office issued a "news brief" regarding Bandit's death.  The news brief stated, in relevant part:

> Yesterday, through the many phone calls and inquiries of citizens, it came to the attention of Maricopa County Sheriff Joe Arpaio about the death of a City of Chandler police dog. Citizens flooded the Sheriff's Animal Abuse Hotline . . . with calls and comments about the death of the police dog.  Upon receiving the information, Sheriff Arpaio ordered his Animal Abuse Investigators to look into the incident.

(Doc. 101-1 at 9.)  It is not clear who authored this news brief or the basis for the author's assertion about a "flood[]" of calls to the animal abuse hotline.  However, the news brief correctly reported that Arpaio had ordered an investigation into Bandit's death.   In Arizona, it is a misdemeanor to "[i]ntentionally, knowingly or recklessly leave[] an animal unattended and confined in a motor vehicle [if] physical injury to or death of the animal is likely to result."  A.R.S. § 13-2910(A)(7).  The Sheriff's Office had jurisdiction over the potential crime because Lovejoy's home is located in an unincorporated County island.

Sheriff's Office Detective Robert Simonson of the Animal Cruelty Unit performed the investigation, supervised by Sergeant Matthew Summers, chief of the same unit.  In affidavits supporting Arpaio's summary judgment motion, both Simonson and Summers insist that Arpaio exerted no pressure on them to ensure the investigation reached a particular conclusion.    From time to time, they provided brief updates on the

investigation's progress to Summers's supervisor, Deputy Chief Dave Trombi. Summers believed that these updates were intended to provide Arpaio with information regarding the investigation because the media would sometimes question Arpaio about it. Simonson recalls Arpaio himself sitting in on one of these meetings, but offering no input.

Detective Simonson documented his investigation in a 16-page report which states that the investigation began on August 13 and fact-gathering concluded on August 30. Among other things, Simonson interviewed Lovejoy, Emary, and Gaylord; he reviewed Lovejoy's cell phone records; and he inspected the SUV in which Bandit died. Simonson's efforts uncovered no evidence that Lovejoy recognized he was leaving Bandit in the SUV, or that Lovejoy was angry at Bandit or would otherwise have any desire to harm Bandit.

On Friday, August 31, 2007, Deputy Chief Trombi sent an e-mail titled "Chandler K-9 meeting" to Summers, Simonson, Lisa Allen (Sheriff's Office director of media relations), and a few other Sheriff's Office employees. In relevant part, the body of the e-mail states:

> I have reserved 90 minutes with the Sheriff for this Tuesday coming [*i.e.*, September 4] regarding the details of the Chandler K-9 investigation. Please be up in the Sheriff's office at 3 pm with everything you would need to answer any questions that might arise. . . . There may be questions regarding the procedures of our personnel in relation to this matter.

(Doc. 101-1 at 25.)

The record contains no evidence directly confirming or denying that the September 4 meeting really happened, and if it did happen, how long it lasted and what was discussed. Arpaio, when specifically asked at his deposition if he attended the meeting, replied, "I don't remember. Possibility is yes." (Doc. 101-1 at 12.) Later in his deposition he was asked, "[Y]ou don't think it's unusual that you would devote 90

minutes of what has to be pretty precious time to talk about a minor misdemeanor investigation?"  To this, Arpaio responded:

> Well, you know, I take animal cruelty very serious. . . .  And so since I take that serious, along with many other things, I — because of the — much publicity surrounding this case.
>
> We are also talking about a law enforcement officer. Regardless of what the charges, whether it's DUI or any other violation that a law enforcement officer may be involved in, I took it — I gave a little time to it.

(*Id*. at 13.)

The day after the possible 90-minute meeting, Simonson added the final paragraph to his investigation report, explaining the decision to charge Lovejoy with a crime:

> 09/05/2007 Upon reviewing all of the evidence and interviews pertaining to this case, the Maricopa County Sheriff's Office Animal Crimes Division believes there is sufficient cause to show that Sgt. Thomas Lovejoy of the Chandler Police Department should be charged with Arizona Revised Statute 13-2910.A.7 Animal Cruelty: Recklessly leaving an animal unattended and confined in a motor vehicle and death of the animal occurred.  Based on his extensive canine training and 4.5 years of experience as a canine handler along with his statements that he placed the canine into his vehicle prior to the start of his extra duty job on the morning of August 11th, 2007 and did not discover the animal until approximately 13.5 hours later, Sgt. Thomas Lovejoy will be charged with one count of ARS 13-2910.A.7 a Class 1 Misdemeanor.

(Doc. 93-2 at 23.)  The report is not specific about who in the "Animal Crimes Division" or elsewhere made the ultimate decision to charge Lovejoy, or how it was determined that Lovejoy had behaved "recklessly."  In a summary judgment affidavit, Summers (Simonson's supervisor) similarly obscures the decisionmaker: "Based on Det. Simonson's investigation, it was determined that there was probable cause to charge Sgt. Lovejoy with animal cruelty in violation of A.R.S. § 13-2910 and that we would charge Sgt. Lovejoy accordingly."  (Doc. 93-2 at 26.)

The mental state under which Lovejoy would be charged — "recklessly" — has a specific definition in Arizona's penal code:

> "Recklessly" means, with respect to a result or to a circumstance described by a statute defining an offense, that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but who is unaware of such risk solely by reason of voluntary intoxication also acts recklessly with respect to such risk.

A.R.S. § 13-105(10)(c). Simonson's summary judgment affidavit explains why he believed that probable cause existed to charge Lovejoy under the "recklessly" standard:

> In determining that probable cause existed, the totality of the circumstances included the fact that Sgt. Lovejoy was mentally and physically exhausted such that he was unable to report to a call-out by a supervisor yet, a few hours later, chose to report to an extra-duty traffic control assignment rather than call in sick.
>
> I also considered that Sgt. Lovejoy chose to take Bandit with him on the extra-duty assignment and placed him in his assigned patrol car despite it not being Sgt. Lovejoy's typical practice to take Bandit to such extra assignments.
>
> I also considered that Chandler Police Department rules and regulations did not require Sgt. Lovejoy to take his assigned canine to an extra-duty traffic control assignment.

(*Id*. at 5–6.)

### C.   Lovejoy's Arrest

On September 5, 2007 — the same day Simonson concluded his investigation report — Simonson called Lovejoy and asked Lovejoy to meet him at "the station" in downtown Phoenix immediately. Lovejoy claims that he asked if they could delay their meeting until later in the day, but Simonson insisted on meeting right away. Lovejoy acquiesced.

While Lovejoy was driving in, Arpaio held a press conference announcing that Lovejoy had been arrested.[2]  Lovejoy claims he learned of his supposed arrest when a reporter reached him on his cell phone while still driving to the station.

When Lovejoy arrived at the station, Summers and Simonson arrested him (without handcuffs) and moved him through the processing, booking, and initial appearance process.  An unspecified Sheriff's Office employee asked the commissioner presiding at the initial appearance to set bail, but the commissioner refused and released Lovejoy.

That same day, the Sheriff's Office issued a "news release" regarding the arrest. Arpaio testified at his deposition that he "reviewed it and approved" the news release "[t]o be disseminated to the media."  (Doc. 93-2 at 88–89.)  The news release quotes Arpaio as saying that the decision to book Lovejoy into jail was "'difficult'" but "'Lovejoy must be treated like anyone else in similar circumstances.  I have a strict policy on animal abuse and neglect whereby offenders are booked into jail.'"  (Doc. 101-1 at 6.)  At his deposition, Arpaio confirmed that he made this statement.

The news release further quotes Arpaio as saying, "'Our investigation determined that Bandit's death was not an intentional act on Lovejoy's part, but it was reckless and for that, Lovejoy must be charged.'"  (*Id.* at 7.)  When asked about this statement at his deposition, Arpaio replied, "That's what the investigate — investigators said, I presume." He was then asked, "You knew when you stepped in front of the cameras [at the press conference] to announce that [Lovejoy] was being charged and put into jail, booked into jail, that [he] had not done anything intentional to hurt that poor dog, didn't you?" Arpaio responded, "Well, I'm not going to get into the law, whether it's intentional or not."  (*Id.* at 16.)

---

[2] At oral argument, counsel for Arpaio stated that there was no evidence this press conference took place.  In briefing, however, Arpaio admitted that the press conference happened.  (*Compare* Doc. 101 at 20 ¶ 21 *with* Doc. 109 at 4 ¶ 21.)

On September 12, 2007 — one week after Lovejoy's arrest — the Sheriff's Office issued an additional "news brief" related to the Lovejoy case, which states in relevant part:

> The August 11, 2007 death of Chandler police dog, Bandit, and the subsequent arrest of his partner and caretaker, Chandler Sgt. Thomas Lovejoy, has sparked such controversy that today, the Arizona Association of Chiefs of Police, at the urging of some police unions, issued a "resolution" decrying Sheriff Arpaio's decision to book the officer into jail.
>
> The Sheriff's Office believes that the "resolution" is an attempt to shift the public's focus away from the Chandler officer by blaming Sheriff Arpaio for overreacting to the situation.    Arpaio, however, remains steadfast about his policy to arrest and book into jail anyone found abusing or neglecting animals.
>
> Some misunderstandings about the facts of the case are apparent in news articles and public comment.
>
> They include the following:
>
> * * *
>
> *       Though Arpaio made the decision to arrest and book Lovejoy into jail, it was conducted in such a way to protect the officer. . . .
>
> * * *
>
> Sheriff Arpaio is in Massachusetts today . . . but he is aware of the Arizona Police Chiefs Association's actions.   He is outraged by their "resolution" and their attempt to make him the bad guy.

(*Id*. at 27–28.)

The record contains nothing about who wrote this "news brief" or the basis of that person's knowledge.    Arpaio, at his deposition, asserted that "whoever wrote this" misspoke when he or she said, "Arpaio made the decision to arrest and book Lovejoy into jail." (Doc. 109-1 at 5.)  Arpaio emphasized that Lovejoy was *booked* into jail based on

- 10 -

1  Arpaio's policy to book all animal cruelty arrestees into jail, but he says did not make the

2  decision to *arrest* Lovejoy.

3         **D.**    **Simonson's Interview with Lovejoy's Defense Attorney**

4          Lovejoy hired attorney Robert Kavanagh to defend him against the animal cruelty

5  charge.  In February 2008, Kavanagh interviewed Simonson about his investigation.  An

6  audio recording was made and later transcribed.  Simonson confirmed in that interview

7  that he learned nothing from either Officer Emary or Commander Gaylord that suggested

8  anything other than that Lovejoy forgot about Bandit.  Kavanagh then asked about what

9  Simonson learned directly from Lovejoy:[3]

10        Q.      Okay.  All right did you find any evidence from what

11                Tom Lovejoy told you that Tom intentionally caused
the death of his dog?

12        A.      Intentionally?

13        Q.      Yes.

14        A.      No.

15

16        Q.      Okay did you find any evidence from what Tom told

17                you that Tom knew that leaving his dog in the car
would cause the dog death that morning, August the

18                11th?

19        A.      Any evidence that if- he knew if he left his dog in the
car would- would suffer injury or death?

20        Q.      Right that he knew it was a car and he knew the dog

21                was back there-

22        A.      Okay, no.

23        Q.      -okay.  What did he tell you that made you think Tom-

24                that- that Tom- that he, himself, acted recklessly?

25        A.      His statement that he placed the dog into the vehicle.

26        [3] The transcript does not use "Q." and "A.," but rather "MR. KAVANAGH" and

27  "DET. SIMONSON."   As reprinted here, "Q." refers to Kavanagh and "A." refers to
Simonson.

28

- 11 -

Q.      Kay.

A.      And- and then his subsequent actions [*sic*] of not taking the dog out of the vehicle.

Q.      Okay.  So the fact that he put the dog in the vehicle-

A.      Yeah.

Q.      -and forgot about it?

A.      Knowingly put the dog in the vehicle, yes.

* * *

Q.      Did you find any evidence that, from your conversation with Tom, that Tom when he left the vehicle that morning at about 9 or 9:15, August 11th, that he was aware that the dog was still back there but disregarded the risk that the dog might die?

A.      No evidence that he disregarded anything.  There was his statement that he forgot the dog was back there.

* * *

Q.      Okay just simply he just didn't remember the dog being there at all?

A.      Correct.

Q.      Okay.  So you found no evidence from what Tom told you that he consciously disregarded the risk that the dog might die from being in the car?

A.      No.

(Doc. 114-1 at 14–16.)  Kavanagh later asked Simonson, "Okay, all right did you find any evidence that Tom Lovejoy was somehow [generally] neglectful of his dog, his police dog?", to which Simonson responded, "No."  (*Id*. at 19.)

Kavanagh also asked Simonson about the final entry on his investigation report:

Q.      Okay.  On page 16, the last page of your report, you kind of sum it up.  You say the Animal Crimes Unit, in essence, believe [*sic*] there was sufficient cause to charge Sergeant Lovejoy with animal cruelty.  Was

1                           that the whole unit that made that decision or who
2                           made that decision?

3         A.     Well my sergeant reviews the case and then Captain
4                Trombi reviews the case.  I don't where [*sic*] else it
                 went beyond that.  I'm going to assume that it
5                probably went all the way to the sheriff.  And then
6                once there's (Indiscernible)- they're- they're satisfied
                 that the case is put together properly and all the
7                components are here and all the questions have been
8                asked and answered then it gets submitted to the
                 County Attorney's Office.

9         Q.     Okay, all right and that's why you said the Animal
10               Crimes Unit because it was- it was a chain-of-
                 command issue?

11        A.     Yes.

12        Q.     It wasn't your decision it was somebody above you?

13        A.     All of our cases are the same way.

14  (*Id.* at 24–25.)  Kavanagh then inquired further about the choice to charge Lovejoy with
15  "recklessly" violating the animal cruelty statute:

16        Q.     Okay.  All right.  As the investigator do you feel this
17               case was a matter of negligence or recklessness?

18        A.     I feel that based on his statement that the- he placed
19               the dog in the vehicle, that he has training- more
20               training than- than an average person, in terms of
                 handling his animal, that I believe that he recklessly
21               left the dog in the vehicle.

22        Q.     Okay so basically the fact that he put the dog in there
                 and he has training?

23        A.     It- it's his partner.  I'm- I- it's my belief that more so
24               than- than an average citizen and- and we- we've
25               charged average citizens with this crime.  So I'm
                 feeling that he should have some expectation knowing
26               where his- his partner's at.

27                                * * *

28

Q.     Okay what type of cases do you charge the average citizen that leave their dogs in the car?

A.     We have- we have one just previous this- I guess it would be probably a year ago now, where a female left a dog- her dog in the car to go inside and go shopping in a mall.

* * *

Q.     Okay I understand [the shopping mall case], all right but that's different than this case?

A.     Yes.

Q.     Where the guy leaves the dog in the car and not even remembering him there and goes in with no intent to go back because he had- would have no reason to go back [']cause he doesn't think the dog's there?

A.     Correct.

* * *

Q.     Okay, all right so I'm just trying to- I'm (Indiscernible)- I don't want to beat a dead horse but the fact that Tom's had canine training and the dog was his partner are the two main reasons why you felt there was sufficient cause to charge him?

A.     Yes.

Q.     Anything else?

A.     Not off the top of my head, it's just the-

Q.     Okay.

A.     -(Indiscernible)- based on the way I read the law-

Q.     Okay.

A.     -and the situation (Indiscernible)-

Q.     Okay.  Did- did you sit down with your sergeant and Trombi and anybody else and discuss this case?

A.     -yes.

- 14 -

Q. And did you look at the statute?

A. Yes we did.

Q. All right and you probably looked at it- at that statute pretty long and hard I would think?

A. [Giggle]  Yeah, mmm-hmm (phonetic).

Q. Okay what- what evidence do you have that Tom consciously disregarded the risk to his dog?

A. The fact that he told us he placed the dog into the vehicle prior to his shift.

Q. Okay (Indiscernible-talk over)-

A. (Indiscernible-talk over)- and his statement that he did not remove the dog at the end of his shift.

(*Id*. at 25–28.)

### E.     The Decision to Take the Case to Trial

Andrew Thomas, then the Maricopa County Attorney, assigned Leonard Ruiz, third in command at the County Attorney's Office and chief of the trial division, to supervise Lovejoy's case.  Ruiz was never told why he received the assignment.  He could not recall another instance of a person with his seniority at the County Attorney's Office being asked to assist in prosecuting a misdemeanor animal cruelty offense.

Deputy County Attorney Anthony Church, who specializes in animal cruelty cases, received the assignment to handle day-to-day tasks associated with the Lovejoy prosecution.  Soon after he received the assignment, Church formed the opinion that the case against Lovejoy was weak:

> [F]rom all the information I had gathered from the police report, [Lovejoy] cared very much about the animal, and I had a hard time believing that he would consciously recognize that the dog was in the back of the car and leave the dog there intentionally or — or, you know, understanding that he would be coming back but knowing the dog was back there.

(Doc. 101-1 at 39–40.)

On March 7, 2008, Church and Ruiz jointly requested an "incident review." An incident review involves submitting the case to a board of senior attorneys who evaluate whether the case should go forward. Church and Ruiz's written request summarized Simonson's findings and added,

> A defense interview with Detective Rob Simonson took place in early February.

> According to Detective Simonson there is no evidence, which he can point toward, to show that Lovejoy did not simply forget that the dog was in the car. Detective Simonson told the defense attorney the only evidence that exists to prove the reckless mindset is that Lovejoy put the dog into the car and Lovejoy failed to take the dog out of the car, causing the dog's death.

(Doc. 101-2 at 4.) Church and Ruiz then quoted the animal cruelty statute under which Lovejoy was charged (*see* p. 5, *above*) and the definition of "recklessly" (*see* p. 8, *above*) and concluded:

> <u>Recklessness requires that the person actually be "aware" of the risk being created by his conduct. In re William G., 192 Ariz. 208, 963 P. 2d 287 (App. 1997).</u>

> This case needs to be set for incident review to determine whether we have probable cause to prosecute this case and whether we can ethically prosecute this case.

(*Id.* at 5 (emphasis in original).)

On March 11, 2008, another Deputy County Attorney, Jeff Trudgian, submitted a memo to Chief Deputy Philip J. MacDonell regarding the Lovejoy case. The memo begins, "Mr. Thomas requested research on the issue of whether 'awareness' of the risk, as needed for a finding of recklessness, can entail forgetfulness — specifically, as applied to a K-9 police officer with specialized training regarding animal handling." (*Id.* at 8.) Trudgian analyzed various cases and the relevant statutes and concluded,

> The problem is the element of "conscious disregard" that the results would occur or the circumstance exists. It cannot be argued that a person who truly forgot an animal in a vehicle

1

2

> *consciously* disregarded a known risk. . . . [¶] . . . [T]he facts
> appear legally insufficient for conviction.

(*Id*. at 10 (emphasis in original).)

On March 28, 2008, yet another Deputy County Attorney, Linda Van Brakel, submitted a memo titled "Lovejoy analysis" to Jim Beene, whose position is unidentified. The memo quotes Church and Ruiz's statement of facts (contained in their incident review request) and then analyzes the relevant law as applied to those facts.  Similar to Trudgian's memo, Van Brakel's states,

> Lovejoy *knew* the dog was in the car because he placed him
> there, but the evidence shows he completely forgot about him.
> In other words, although Lovejoy was no doubt *aware* of the
> risk of leaving a dog in a hot car that long, he did not
> *consciously disregard* that risk.  He simply forgot.  That may
> be negligent, but it is probably not criminally reckless.

(*Id*. at 27 (emphasis in original).)   Van Brakel considered but rejected a recklessness argument based on sleep deprivation:

> Lovejoy should have realized that he was sleep-deprived and
> might forget about the dog.  However, police officers working
> graveyard shifts, swing shi[f]ts, off-duty jobs, and getting
> called out at all hours, are commonly sleep deprived and this
> might be considered normal for a police officer.   In other
> words, loading the dog in the car under the circumstances
> probably did not create a substantial risk of harm constituting
> a gross "flagrant and extreme" deviation from the conduct of
> a police officer or K9 officer.   Leaving him in the car, of
> course, would create a substantial risk of harm constituting a
> gross deviation from the conduct of a K9 officer, but we lack
> the "conscious disregard" of such a risk.

(*Id*.)  Van Brakel ultimately concluded, "I do not believe there is a reasonable likelihood that it can be proven beyond a reasonable doubt that Lovejoy acted with criminal recklessness, causing Bandit's death."  (*Id*. at 31.)

The record before the Court does not reveal whether County Attorney Thomas reviewed any of this material.  However, he turned down Church and Ruiz's incident

- 17 -

review request.  Ruiz did not ask for an explanation, but he and Church then refused to continue prosecuting Lovejoy.

Thomas reassigned the case to Deputy County Attorney Lisa Aubuchon, who pressed forward.  Aubuchon testified at her deposition that she read Simonson's investigation report and may have talked to Simonson.  She also claims she wrote a memorandum analyzing the case and concluding that there was a reasonable likelihood of conviction under the recklessness standard.  That memorandum is not in the record. When asked at her deposition how she intended to satisfy the recklessness requirement at trial, Aubuchon responded,

> Well, generally I was looking at it as Mr. Lovejoy had made decisions, had made — taken — he had made choices throughout to focus on overtime, to work other types of jobs instead of getting sleep, for example, so that he would be fresh and ready to go on — on his job.  And I knew that one of his main jobs was to take care of Bandit and to make sure that Bandit, you know, was — was safe, had water, had food, was not being placed in a car to bake to death.  He had responsibilities to Bandit, and he chose to go out and do other off-duty jobs instead of getting rest and getting sleep.  He chose to go shopping.  He chose to go out to dinner.  He chose to go out to lunch instead of choosing to take care of Bandit.
>
> And that was kind of my theory throughout . . . .

(Doc. 93-2 at 56.)

As for Arpaio's potential participation in the decision to continue prosecuting Lovejoy, the record contains little direct evidence other than denials by the principal persons involved.  Thomas testified at his deposition that Arpaio put no pressure on him. Aubuchon similarly testified that she felt no pressure from anyone to continue pursuing Lovejoy.  Arpaio himself testified, "I can make all the arrests I want, but it's up to the prosecutor to prosecute. * * * And so I may have had a comment [to Thomas], because he also was very active in prosecuting animal cruelty cases."  (Doc. 101-1 at 17.)

1

**F.    The Trial**

Lovejoy's case went to a bench trial in front of a Justice of the Peace on August

15, 2008.  After Aubuchon presented the State's case, Lovejoy's defense attorney moved

for a directed verdict:

> Judge, the statute as we've been talking about all morning
> requires the culpable mental state of recklessly.  And for the
> State to prove that, they have to show that Sergeant Lovejoy
> was aware of a substantial and unjustifiable risk, i.e., the dog
> was in the car, and that if he left him in there, he would die or
> become injured. . . .
>
> They have shown that he left the car — the dog in the car.
> No one is disputing that.  They haven't shown . . . that he
> knew the dog was back there, but disregarded the risk that he
> might die.

(Doc. 93-1 at 56.)

In response, Aubuchon argued,

> We don't have to show that he knowingly left the dog in the
> car. . . .
>
> *  *  *
>
> We are not arguing that he knew he left the dog in the car,
> because we would have charged it that way.  We're arguing
> that he's reckless.  And it is his very conduct and the choices
> he made that shows he substantially disregarded that risk.
> Everybody knows that in August in Arizona it is hot in a car.
> And a trained K-9 officer should be on heightened awareness
> about what will happen if he forgets the dog in the car.

(Doc. 93-1 at 57–58.)

At the close of argument, the Court announced without elaboration, "At this time

I'm going to deny the directed verdict."  (Doc. 93-1 at 62.)  Lovejoy then put on his

defense, after which the Court stated: "All of these so-called distractions [presented by

the State as evidence of recklessness] . . . don't equal — it doesn't equal to me to be

recklessness.  State did not meet their — their burden here and I find [Lovejoy] not

guilty."  (Doc. 93-1 at 71–72.)

- 19 -

### G.   The Lovejoys' Alleged Injuries

Lovejoy claims he suffered a loss of income and earnings as a result of the events surrounding his arrest and prosecution.  He also claims to have developed continuing medical problems from the stress of those events.  He and his wife allege that they have suffered emotional trauma and that his wife's business has been adversely affected by the negative publicity.  Finally, the Lovejoys assert that defending against the prosecution cost them approximately $25,000 in legal fees.

## II.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial.  At bottom, the question to be answered is whether sufficient evidence exists from which a reasonable jury could find in favor of the party opposing the summary judgment motion.  In this case, then, Arpaio's summary judgment motion puts into question whether Lovejoy has enough evidence from which a reasonable jury could find Arpaio liable in his individual or official capacity for the alleged misconduct.

Arpaio bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which he believes demonstrate the absence of any genuine issue for the jury to decide.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Because Lovejoy would bear the burden of persuasion at trial, Arpaio may carry his initial burden of production by submitting admissible "evidence negating an essential element of [Lovejoy's] case," or by showing, "after suitable discovery," that Lovejoy "does not have enough evidence of an essential element of [his] claim or defense to carry [his] ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105–06 (9th Cir. 2000).

Lovejoy must then respond with specific facts, supported by admissible evidence, showing a genuine factual dispute such that a jury trial is necessary to resolve it.  *See* Fed. R. Civ. P. 56(c).  But allegedly disputed facts must be material — the existence of only "*some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

In evaluating this record, the Court will "draw all reasonable inferences in favor of [Lovejoy], and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The Court may only determine whether a jury could reasonably evaluate the evidence in a manner favorable to Lovejoy.

When the parties' evidence contradicts, this is usually sufficient to create a jury issue. But "a jury may [also] properly refuse to credit even uncontradicted testimony," *Guy v. City of San Diego*, 608 F.3d 582, 588 (9th Cir. 2010), "so long as it does so with good reason," *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 n.8 (9th Cir. 1985). Examples of such good reasons include inherent unbelievability, *id.*, uncertainty "cloud[ing]" the testimony, *id.*, and a witness's interest in the outcome of the case, *Reeves*, 530 U.S. at 151. Nonetheless, if the record taken as a whole could not lead a rational jury to find for Lovejoy, there is no need for a trial and summary judgment should be entered in Arpaio's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III.   ADMISSIBILITY OF CERTAIN EVIDENCE

As noted, evidence submitted at the summary judgment phase must be admissible at trial. Arpaio claims that the Sheriff's Office press releases are inadmissible hearsay.

There is substantial evidence from which a reasonable jury could conclude that the August 14 and September 5 press releases entirely comprise statements made "by a person authorized . . . to make a statement concerning the subject," and are therefore nonhearsay admissions as against Arpaio in his supervisory capacity. Fed. R. Evid. 801(d)(2)(c). Arpaio testified that he "reviewed . . . and approved" the September 5 press release "[t]o be disseminated to the media," and a jury could reasonably conclude that he did the same for the August 14 press release, considering that he acknowledges its accuracy when it says, "Sheriff Arpaio ordered his Animal Abuse Investigators to look

into the incident." (Doc. 101-1 at 9.) Even if these statements could not come in for their truth, they evince Arpaio's state of mind, to the extent he had any input in deciding whether to arrest and prosecute Lovejoy. Fed. R. Evid. 803(3).

The September 12 press release is less clear. Lovejoy wants it admitted for the truth of the statement, "Arpaio *made the decision to arrest* and book Lovejoy into jail." (Doc. 101-1 at 27 (emphasis added).) However, Arpaio plausibly asserts that this statement was not authorized by him. The press release itself says that Arpaio was in Massachusetts that day. Accordingly, on this record, there is not substantial evidence from which a jury could conclude that Arpaio authorized the statements in the September 12 press release. It cannot come in for its truth on this motion.

## IV. SUMMARY OF ARGUMENTS

Lovejoy asserts that his arrest and prosecution violated his constitutional rights. Assuming that to be the case, Lovejoy could conceivably have brought this lawsuit against all of the police officers involved in the arrest and prosecution. But the only individual Lovejoy seeks to hold liable is Arpaio. He also seeks to hold Maricopa County liable, but on the theory that Arpaio's actions as Sheriff effectively constitute County "policy." In other words, Lovejoy's case turns on showing that Arpaio was ultimately responsible for both the arrest and prosecution, despite others' participation. Lovejoy believes that Arpaio acted out of a desire for "tough on animal abuse" publicity and general political gain.

Arpaio's motion for summary judgment seeks to establish that no trial is necessary in this case and that he is entitled to judgment as a matter of law. His arguments are many-layered, as is often the case when a plaintiff seeks to hold a police officer liable for his or her official conduct. American law intentionally provides many layers of protection to police officers facing such suits.

Arpaio first argues that Lovejoy lacks evidence connecting him to the decision to arrest and prosecute Lovejoy. In other words, even if Lovejoy was wrongfully arrested and prosecuted, Arpaio says that Lovejoy does not have enough evidence from which a

jury could conclude that Arpaio participated in those actions.  Second, Arpaio claims that the arrest and prosecution were constitutional — regardless of whether he participated — because probable cause existed.  Third, he asserts that probable cause arguably existed (even if it did not actually exist) and he is therefore entitled to qualified immunity in his individual capacity.  Fourth, he claims that the County Attorney's decision to prosecute Lovejoy insulates him from liability for any injuries inflicted after that decision.  Fifth, he argues that Maricopa County is not liable.  Finally, he attacks Lovejoy's claim that, even if probable cause existed, Arpaio had no rational basis to treat Lovejoy differently from other similarly situated police officers — a claim which, if proved, potentially states a violation of the Constitution's equal protection clause.

The Court will begin untangling these arguments by first addressing probable cause.  As discussed below, the record currently before the Court shows that probable cause to arrest and prosecute did not exist, and no reasonable person could think it did.  This itself provides evidentiary inferences relevant to the question subsequently discussed: whether evidence exists from which a jury could conclude that Arpaio shares personal responsibility for the arrest and the prosecution.  Because such evidence exists, the Court will also address whether Maricopa County can be liable for Arpaio's alleged wrongful acts.  Finally, the Court will address Lovejoy's equal protection claim, which does not depend on probable cause.

## V.  PROBABLE CAUSE & QUALIFIED IMMUNITY

### A.  Probable Cause Generally

The Fourth Amendment requires the government to have "probable cause" to arrest and charge a person with a crime.  "Probable cause" means that "at that moment [of the arrest] the facts and circumstances within [the police's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  An arrest without probable cause is unconstitutional.  *Torres v. City of Los Angeles*, 548 F.3d 1197, 1207 (9th Cir. 2008).

1    A prosecution is likewise unconstitutional unless probable cause exists at the time

2  of the prosecution.  *Webb v. Sloan*, 330 F.3d 1158, 1163 (9th Cir. 2003).  Theoretically,

3  an arrest without probable cause could still result in a prosecution *with* probable cause (if,

4  *e.g.*, a post-arrest investigation turned up better evidence); and an arrest with probable

5  cause can lead to a prosecution *without* probable cause (if, *e.g.*, a post-arrest investigation

6  exonerates the suspect).   In Lovejoy's case, however, the arrest and prosecution were

7  both justified on a theory that Lovejoy's sleep deprivation led him to recklessly endanger

8  Bandit.   There was no post-arrest investigation that modified that theory.   Accordingly,

9  the arrest and prosecution stand or fall together — either they were both constitutional, or

10  both unconstitutional.

11    **B.    Effect of Ariz. R. Crim. P. 20 Motion**

12    Arpaio insists that this Court cannot adjudicate the constitutionality of the arrest

13  and prosecution because the state criminal court supposedly already did so.   Arpaio's

14  argument is incorrect.

15    At the close of the State's evidence in Lovejoy's criminal trial, Lovejoy's attorney

16  moved for a judgment of acquittal under Arizona's Criminal Rule 20:

17    > On motion of a defendant or on its own initiative, the court
18    > shall enter a judgment of acquittal of one or more offenses
19    > charged in an indictment, information or complaint after the
    > evidence on either side is closed, if there is no substantial
    > evidence to warrant a conviction. . . .   The court's decision on
20    > a defendant's motion shall not be reserved, but shall be made
21    > with all possible speed.

22  Ariz. R. Crim. P. 20(a).  In response to Lovejoy's motion., the Justice of the Peace ruled,

23  "At this time I'm going to deny the directed verdict."   (Doc. 93-1 at 62.)   Arpaio argues

24  that this ruling establishes "substantial evidence to warrant a conviction," which is more

25  than necessary for probable cause, and Lovejoy is collaterally estopped from arguing

26  otherwise.

27    However, the transcript does not make clear that the Justice of the Peace made a

28  final ruling after the close of Rule 20 arguments.  He stated, "*At this time* I'm going to

deny the directed verdict" (emphasis added). "At this time" could be interpreted as throat-clearing, but also as expressing an intent to defer the ruling. Although the Rule states that "[t]he court's decision on a defendant's motion shall not be reserved," judges nonetheless commonly defer such rulings simply to hear the entire case, perhaps out of an abundance of caution. And when the Justice of the Peace acquitted Lovejoy, he framed his explanation in terms of a failure of the State's evidence to satisfy the recklessness standard. (*See id*. at 71–72 ("All of these so-called distractions . . . don't equal — it doesn't equal to me to be recklessness. State did not meet their — their burden here . . . .").) If anything, it appears that the Justice of the Peace ultimately granted Lovejoy's motion.

Second, Lovejoy points out that (1) Arizona has never resolved the question of whether a Rule 20 motion establishes probable cause but (2) other jurisdictions have held that their analogues to Rule 20 do not preclude subsequent litigation of the issue. *See Jankowiak v. McAllister*, 503 N.Y.S.2d 951, 954 (N.Y. Cnty. Ct. 1986); *Pinkerton v. Edwards*, 425 So. 2d 147, 150 (Fla. Dist. Ct. App. 1983). Arpaio has not attempted to distinguish this authority and it otherwise appears persuasive. The Court therefore predicts that Arizona state courts would hold that denial of a Rule 20 motion has no effect on subsequent civil litigation over whether probable cause existed. Accordingly, the Court will resolve whether probable cause existed to arrest and prosecute Lovejoy.

### C.      Proper Focus of Probable Cause & Qualified Immunity Inquiries

Lovejoy argues that probable cause did not exist either when he was arrested or prosecuted. He seeks to hold Arpaio liable, but the inquiry must begin with Simonson because the decisions to arrest and to prosecute were founded on the findings of Simonson's investigation. There is no evidence or argument that anyone involved knew more than Simonson. Accordingly, if the facts and circumstances known to Simonson justified Lovejoy's arrest and prosecution, it would likewise justify Arpaio under any theory of supervisory liability.

In addition, even if Simonson was not justified *and* Lovejoy can prove that Arpaio was culpably involved (discussed further at Part VI, *below*), Lovejoy still cannot hold Arpaio personally liable unless Arpaio's conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable officer would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This doctrine, known as "qualified immunity," acknowledges the reality that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  Thus, a government official is immune from suit unless (1) he or she violated a constitutional right, and (2) the constitutional right was clearly established at the time of the violation.  *See Ashcroft v. al-Kidd*, ___ U.S. ___, ___, 131 S. Ct. 2074, 2080 (2011).

With respect to Lovejoy's claim that he was unlawfully arrested,

> the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for arrest — that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity.

*Rosenbaum v. Washoe Cnty.*, 654 F.3d 1001, 1006 (9th Cir. 2011) (emphasis in original). In this case, these same two questions govern probable cause to prosecute because Aubuchon concluded that probable cause to prosecute existed for the same reasons as probable cause to arrest.

It bears noting that the present inquiry is about a mistake of law rather than a mistake of fact — *i.e.*, a mistake over whether the law *prohibits* what Lovejoy did, not a mistake over *what* Lovejoy did.  Qualified immunity protects mistakes of law as much as mistakes of fact.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  But if the mistake of law is "unreasonable," then "the officer will appropriately be liable."  *Rosenbaum*, 654 F.3d at 1010.

1

**D.      Lack of Probable Cause & Qualified Immunity**

2      The question, then, is whether probable cause existed, and if not, whether it was at

3 least reasonably arguable.  "[P]robable cause supports an arrest so long as the arresting

4 officers had probable cause to arrest the suspect for any criminal offense, regardless of

5 their stated reason for the arrest, [but] an arrest is still unlawful unless probable cause

6 existed under a specific criminal statute."  *Torres*, 548 F.3d at 1207 (citations omitted).

7 Here, the only specific statute Lovejoy was ever accused of violating is Arizona's animal

8 cruelty statute: "A person commits cruelty to animals if the person * * * [i]ntentionally,

9 knowingly or recklessly leaves an animal unattended and confined in a motor vehicle and

10 physical injury to or death of the animal is likely to result."  A.R.S. § 13-2910(A)(7).

11      Lovejoy was charged and prosecuted for "recklessly" violating this statute.  As

12 noted above, "'Recklessly' means, with respect to a result or to a circumstance described

13 by a statute defining an offense, that a person is aware of and consciously disregards a

14 substantial and unjustifiable risk that the result will occur or that the circumstance exists."

15 *Id*. § 13-105(10)(c).  Only a voluntarily intoxicated person can be reckless *without*

16 awareness of the risk.  *Id*.  "Voluntary intoxication" is "intoxication caused by the

17 knowing use of drugs, toxic vapors or intoxicating liquors."  *Id*. § 13-105(43).

18      Considering these principles and definitions, the probable cause inquiry could be

19 framed as follows: If a prudent person learned what Simonson learned in his

20 investigation, could that person believe that Lovejoy was "aware of and consciously

21 disregard[ed] a substantial and unjustifiable risk that" he left Bandit "unattended and

22 confined in a motor vehicle and physical injury to or death of [Bandit] [was] likely to

23 result"?  However, the danger of leaving a dog in a hot vehicle is not contested.

24 Therefore, whether probable cause existed reduces to this question: What evidence did

25 Simonson have that that Lovejoy was aware of but consciously disregarded the fact that

26 he was leaving Bandit in the SUV?

27

28

Simonson had no direct evidence of awareness and conscious disregard — *i.e.*, Lovejoy did not confess that he consciously chose to leave Bandit in the vehicle. Simonson therefore relied on circumstantial evidence, as is usually the case when evaluating state of mind. *State v. Dusch*, 17 Ariz. App. 286, 287, 497 P.2d 402, 403 (1972).

Circumstantial evidence relevant to this inquiry could have taken several forms. A neighbor's eyewitness report that Lovejoy got out of his vehicle, looked into Bandit's kennel, paused, and then walked into the house would provide strong circumstantial evidence that Lovejoy consciously disregarded the risk to Bandit. Testimony from the person to whom Lovejoy was talking on his cell phone when Lovejoy pulled into his driveway might likewise circumstantially evince a conscious disregard of the risk to Bandit. If Lovejoy told that person, "I just pulled in, I'm going to run inside for a few minutes and grab something to eat and be right back out," one might reasonably infer that the urgency of going "right back out" arose from Lovejoy's knowledge of Bandit's situation.

Another source of circumstantial evidence would be testimony that Lovejoy frequently left his animals in the car unattended. *Compare Illinois v. Kozlow*, 301 Ill. App. 3d 1, 703 N.E.2d 424 (Ct. App. 1998) (baby died from being left in a hot car; mother's recklessness inferred from, among other things, a habit of leaving the baby in the car while she visited friends and ran errands). Testimony that Lovejoy had been angry at Bandit that day could also supply a reasonable inference of conscious disregard. *Compare Arteaga v. Texas*, No. 01-00-00482-CR, 2002 WL 1935268, 2002 Tex. App. LEXIS 6096 (Ct. App. Aug. 22, 2002) (baby died from being left in a hot car; mother's recklessness inferred from, among other things, evidence that the mother did not want the baby). Evidence that Lovejoy had ignored a specific directive to take precautions in a high risk situation could likewise support an inference of conscious disregard. *Compare Tennessee v. Every*, No. W2005-00547-CCA-R3-CD, 2007 WL 1860789, 2007 Tenn. Crim. App. LEXIS 512 (Crim. App. June 28, 2007) (child died from being left on a

daycare bus; daycare worker ignored specific instruction to walk the length of the bus to ensure that all children had exited).  Finally, evidence of voluntary intoxication can supply the requisite mental intent.  A.R.S. § 13-105(10)(c) ("A person who creates such a risk but who is unaware of such risk solely by reason of voluntary intoxication also acts recklessly with respect to such risk.").

The foregoing examples are not exhaustive, but it is telling that Arpaio has not pointed to any evidence of this kind.[4]  Simonson, in his interview with Kavanagh, instead stated that recklessness was somehow evident from the fact that Lovejoy "placed the dog into the vehicle" and "his subsequent actions [*sic*] of not taking the dog out of the vehicle" (Doc. 114-1 at 15) combined with Lovejoy's "training . . . in terms of handling his animal" (*id*. at 25).  Simonson's summary judgment affidavit further explains that his probable cause determination relied heavily on Lovejoy's "mental[] and physical[] exhaust[ion]," Lovejoy's choice not to call in sick for the extra-duty assignment, Lovejoy's choice to take Bandit with him on the extra-duty assignment "despite it not being Sgt. Lovejoy's typical practice to take Bandit to such extra assignments," and "Chandler Police Department rules and regulations [which] did not require Sgt. Lovejoy to take his assigned K-9 to an extra-duty traffic control assignment."  (Doc. 93-2 at 5–6; *see also* Doc. 114-1 at 14–16, 25–28.)  Aubuchon persisted in this vein, arguing that Lovejoy "had responsibilities to Bandit, and he chose to go out and do other off-duty jobs instead of getting rest and getting sleep."  (Doc. 93-2 at 56.)  Arpaio's summary judgment synthesizes these arguments, claiming that

> Lovejoy's decision to ignore his fatigue and illness and take Bandit to an extra-duty shift plainly created a substantial risk of harm to Lovejoy, Bandit, and potentially anyone else

---

[4] Arpaio attempts to create a voluntary intoxication issue through expert testimony about the equivalence between sleep deprivation and chemical intoxication.  (Doc. 94-1 at 11.)  As noted above, however, Arizona's definition of "voluntary intoxication" specifically requires "knowing use of drugs, toxic vapors or intoxicating liquors."  A.R.S. § 13-105(43).  The record contains no evidence of such intoxication.

> Lovejoy encountered that morning. . . .  Lovejoy was reckless when he failed to call in sick to his extra-duty shift and placed Bandit in harm's way knowing that he was responsible for Bandit's welfare.

(Doc. 94-1 at 11–12.)   At oral argument on this motion, counsel for Arpaio offered an extension of this theory, arguing that the entire course of events from Lovejoy's inability to sleep through the point that he discovered Bandit's body evince recklessness.

These interpretations have no arguable connection to the relevant statutes.  Indeed, one must ignore the statutes' plain language to offer these interpretations.  For example, the notion that Lovejoy was reckless for his sleep-deprived choice to *put* Bandit in the vehicle for the extra-duty shift (somehow against his training) ignores the animal cruelty statute's explicit requirement that the offender must "*leav[e]* an animal *unattended and confined* in a motor vehicle."  A.R.S. § § 13-2910(A)(7) (emphasis added).  These are not technical terms of art.   These are ordinary words used by ordinary people.   When Lovejoy *put* Bandit into the SUV and then put himself behind the wheel, Lovejoy was in no sense *leaving* Bandit "unattended and confined in a motor vehicle."

Moreover, if the sleep-deprivation theory is correct, it would lead to an absurd result.  The statute is plain that death or injury is not a required element of the offense.  Death or serious injury need only be "likely to result."  *Id*.  Thus, if Lovejoy's sleep-deprived choice to *put* Bandit in the vehicle created the situation where death or injury was likely to result — *e.g.*, because Lovejoy should have known that he might forget Bandit — then probable cause to arrest and prosecute Lovejoy existed from the moment Lovejoy left with Bandit for his extra-duty shift.  Indeed, probable cause would have existed *even if he took Bandit out of the vehicle immediately after arriving home*.

No reasonable person could think that this is how the animal cruelty statute actually works — it makes no sense.  However tired you may be, however much training you may have regarding animals, the statute does not criminalize the choice to bring your animal with you.   It criminalizes the choice to "leave[] an animal unattended and confined in a motor vehicle," A.R.S. § 13-2910(A)(7), and nothing more.

The definition of "recklessly" likewise undermines Arpaio's (and Simonson's and Aubuchon's) theory.  That definition plainly states that the reckless mental state must be "with respect to . . . *a circumstance described by a statute*" and the offender must be "*aware of and consciously disregard[] a* substantial and unjustifiable risk that . . . *the circumstance exists.*"   A.R.S. § 13-105(10)(c) (emphasis added).   Here, again, the "circumstance described by a statute" was the act of "leav[ing] an animal unattended and confined in a motor vehicle."  A.R.S. § 13-2910(A)(7).  Thus, probable cause existed only if Lovejoy was "aware of and consciously disregarded" the existing circumstance of "leav[ing] [Bandit] unattended and confined in [the SUV]."

On this record, no evidence supports this proposition.  On the contrary, everything Simonson learned in his investigation pointed to tragic distraction rather than "aware[ness] . . . and conscious[] disregard[]."   No criminal statute prohibits such distraction.  *See*, *e.g.*, *Rosenbaum*, 654 F.3d at 1007 (probable cause lacking because no criminal statute prohibited suspect's conduct).

Arpaio nonetheless claims that probable cause, if lacking, was still reasonably arguable because according to testimony from Lovejoy's police practices expert, "police officers do not generally apply probable cause to the [state of mind] element of a particular crime, as that is a 'prosecutorial distinction.'"  (Doc. 94-1 at 14.)   But if Lovejoy's expert's opinion is relevant at all, it only highlights the fact that Lovejoy's was not the "general[]" case.  Simonson's investigation report and the September 5, 2007 news release both address the state of mind element of the offense for which Lovejoy was charged.  Indeed, the news release discusses two potential states of mind: reckless and intentional.  Someone at the Sheriff's Office was paying attention to the state of mind element.  Arpaio's argument in this regard therefore fails.

Arpaio further argues that "the difference between recklessness and negligence . . . is subtle and not easily distinguishable for lawyers, let alone police officers."  (*Id.*)  For two reasons, this argument is unavailing.  First, one need not understand anything about any state of mind to know that putting your animal and yourself into a vehicle is different

from "leav[ing] an animal unattended and confined in a motor vehicle."  A.R.S. § 13-2910(A)(7).  Second, the difference between "recklessness" and "negligence" in this case was not left to anyone's opinion.  Arizona's penal code defines recklessness, and the definition is not ambiguous.  "Recklessly" means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the circumstance described by the statute defining the offense exists.  *Id*. § 13-105(10)(c).  These are not technical words.  And there is only one relevant circumstance in the statute defining the offense for which Lovejoy was charged: "leav[ing] an animal unattended and confined in a motor vehicle."  *Id*. § 13-2910(A)(7).  Thus, there was only one interpretation available: Lovejoy violated the statute only if he was aware of and consciously disregarded a substantial and unjustifiable risk that he was leaving Bandit unattended and confined in a motor vehicle.

Any other interpretation is unreasonable — and therefore unworthy of qualified immunity — for an official in Simonson's position, whose familiarity with the animal cruelty statute must be presumed, given his assignment to the Animal Cruelty Unit. Indeed, Simonson confirmed in his interview with Kavanagh that he, Summers, and Trombi "looked at . . . that statute pretty long and hard." (Doc. 114-1 at 28.)  Whether a reasonable official in Arpaio's supervisory position could make the same mistake depends on what Arpaio knew, a question which cannot be resolved through summary judgment (as discussed in Part VI, *below*).

Thus, summary judgment on probable cause and qualified immunity are inappropriate — either in favor of Arpaio or Lovejoy.  Although the relevant facts appear undisputed and Arpaio's arguments fail to establish probable cause and qualified immunity as a matter of law, Lovejoy did not cross-move to affirmatively establish lack of probable cause or qualified immunity.  The Court therefore cannot rule in favor of Lovejoy on those issues at this time.  However, to the extent that Arpaio persists at trial with the theories and evidence advanced thus far, a directed verdict for Lovejoy on probable cause and qualified immunity awaits.

## VI.     ARPAIO'S ALLEGED PERSONAL INVOLVEMENT

### A.     The Decision to Arrest and Charge

On this record, it was unconstitutional to arrest Lovejoy for animal cruelty.  But as noted previously, Lovejoy has not sued the officers who actually performed the arrest (Simonson and Summers).  Lovejoy hangs his entire case on proving that Arpaio was responsible.

A supervisor may be liable for subordinates' unconstitutional acts if the supervisor engaged in "culpable action or inaction in the training, supervision, or control of his subordinates."  *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).  Thus, a supervisor may be liable if he or she:

- sets in motion a series of acts by others, or knowingly refuses to terminate a series of acts by others, which he knows or reasonably should know, would cause others to inflict the constitutional injury;

- acquiesces in the constitutional deprivations of which the complaint is made; or

- otherwise engages in conduct that shows a reckless or callous indifference to the rights of others.

*See id*.   Summary judgment in favor of Arpaio is appropriate unless Lovejoy has sufficient evidence from which a jury could conclude that one of these supervisory liability standards it met.

Sufficient evidence exists from which a reasonable jury could conclude that Arpaio, in his supervisory role, acted to ensure that Lovejoy would be charged, or culpably failed to act to prevent others from bringing such charges.  Arpaio has denied such involvement but a jury may disbelieve that testimony because other circumstances place it into doubt, including that Arpaio is a party to this action and therefore interested in the outcome.  Arpaio nonetheless points to Simonson and Summers, both of whom stated in their summary judgment affidavits that Arpaio applied no pressure to ensure they reached a particular result.  Arpaio characterizes this as uncontradicted evidence that

he has no personal responsibility for Lovejoy's injuries.  But Simonson's and Summers's affidavits do not go this far.  Simonson and Summers state only that they felt no pressure during the *investigation*.  The relevant issue, at least as it relates to Arpaio's potential supervisory liability, is not the investigation, but the decision to *arrest and charge*.  Summers's affidavit is worded such that it is impossible to tell who made that decision.  Simonson's affidavit says nothing about who decided to charge Lovejoy.  His investigation report says that the "Animal Crimes Division believe[d] there [was] sufficient cause" to charge (Doc. 93-2 at 23), but it does not say that the "Animal Crimes Division" made the decision to charge.  In his interview with Kavanagh, Simonson stated that officers higher in the chain of command made that decision — at least as high as Deputy Chief Trombi, and he "assume[d] that it probably went all the way to the sheriff." (Doc. 114-1 at 24.)  Without additional foundation, this statement is not admissible to prove that Arpaio made the decision, but it at least shows that Simonson cannot say that Arpaio did not make that decision.

The foregoing establishes that a jury need not accept the evidence supposedly exculpating Arpaio, but on its own, it raises no inculpatory inference either.  On that score, Arpaio's wildly off-base interpretation of the statutes defining animal cruelty and recklessness creates an inference in Lovejoy's favor.  Simonson, Aubuchon, and Arpaio have consistently defended an interpretation of those statutes that disregards almost all of their the language.  Whereas the statute explicitly outlaws "leav[ing] an animal unattended and confined in a motor vehicle," A.R.S. § 13-2910(A)(7), Arpaio insists on changing "leave" to "put," erasing "unattended and confined," and perhaps inserting a clause that places extra requirements on those with special animal training — thus making Lovejoy and officers like him liable for animal cruelty at the moment they drive away with their dogs while sleep-deprived, even if they immediately let their dogs out upon arriving at their destination.  As discussed above, such an interpretation is not reasonable.  Indeed, it is so far from reasonable that a rational jury could infer that someone in the Sheriff's Office was intent on charging Lovejoy no matter what.

1   This does not necessarily point to Arpaio, but Lovejoy may reasonably bridge that
2   inferential gap through Arpaio's admissions that he "take[s] animal cruelty very serious"
3   and he "gave a little time to" the Lovejoy investigation (Doc. 101-1 at 13); and through
4   the 90-minute meeting that supposedly took place on September 4, 2007 between Arpaio,
5   Trombi, Simonson, Summers, the Sheriff's Office media director, and certain other
6   Sheriff's Office employees.  The only stated purpose of that meeting was to discuss the
7   Lovejoy investigation.  No witness has directly confirmed that the meeting took place but
8   neither has any witness claimed to the contrary.  Arpaio nonetheless says he does not
9   remember if he attended the meeting.  Apparently Simonson and Summers were never
10  asked — although Simonson's "assum[ption] that [the decision to charge Lovejoy]
11  probably went all the way to the sheriff" is inconsistent at least with Simonson's own
12  attendance at that meeting, if it happened.[5]   Nonetheless, a 90-minute meeting was
13  announced with the sole purpose of discussing the Lovejoy investigation, and one day
14  after the meeting was scheduled to take place: (1) Simonson concluded his investigation
15  report by stating that Lovejoy would be charged with "recklessly" causing Bandit's
16  death; (2) Simonson and Summers arrested Lovejoy; (3) Arpaio held a press conference
17  announcing the arrest (while Lovejoy was en route to the Sheriff's Office without having
18  been told he was going to be arrested); and (4) the Sheriff's Office issued a press release
19  — which Arpaio reviewed and approved — attributing to Arpaio the statement that
20  "[o]ur investigation determined that Bandit's death was not an intentional act on
21  Lovejoy's part, but it was reckless and for that, Lovejoy must be charged" (Doc. 101-1
22  at 7).

23      Rational jurors could interpret all of this as evidence that the meeting took place,
24  which Arpaio attended, and the meeting resolved the question of how to interpret the
25  statute such that it could apply to Lovejoy — including the specific choice to charge him

---

[5] Kavanagh apparently did not know about the alleged meeting at the time he
interviewed Simonson, and Lovejoy did not depose Simonson or Summers.  Their
summary judgment affidavits say nothing about the meeting.

under the "recklessly" prong.  Considering the unreasonableness of such an interpretation, sufficient evidence exists from which a reasonable jury could conclude that Arpaio made the executive decision to arrest Lovejoy, or acquiesced in others' decision to do so, having been fully informed of the relevant facts and law and understanding that probable cause did not exist, or behaving with callous indifference to whether probable cause existed.

### B.      The Decision to Continue Prosecuting

Although both the arrest and prosecution were unconstitutional on this record, the prosecution caused the bulk of Lovejoy's claimed injuries — including attorneys fees paid to his criminal defense attorney.  The question is who can be held responsible for those injuries.  Arguably the prosecutor, not the police, caused those injuries because the prosecutor carried out the prosecution.  But the law does not permit Lovejoy to sue the prosecutor: "[I]n initiating a prosecution and in presenting the State's case, the prosecutor is [absolutely] immune from a civil suit for damages." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976); *see also Restatement (Second) of Torts* § 656 (1977) ("A public prosecutor acting in his official capacity is absolutely privileged to initiate, institute, or continue criminal proceedings.").

Although Lovejoy cannot pursue the prosecutor, the law does leave him without a remedy.  Two legal theories permit plaintiffs in Lovejoy's situation to attempt to hold the police responsible for prosecution-related injuries.  Under the first theory, the plaintiff asserts that the prosecution was a foreseeable consequence of the arrest, and therefore the injuries caused by the prosecution are natural extensions of the injuries caused by the unconstitutional arrest.  *See, e.g.*, *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991); *Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988).

Under the second theory, the plaintiff attempts to show that a police officer engaged in some sort of behavior intended to ensure a prosecution regardless of probable cause.  *Smiddy v. Varney*, 665 F.2d 261, 266–67 (9th Cir. 1981).  This theory recognizes that procuring an unconstitutional prosecution is unlawful regardless of whether the arrest

was unlawful — indeed, whether or not the procuring officer had anything to do with the arrest.

Lovejoy attempts to hold Arpaio liable under one or both of these theories.  But even so, he must still "get around the prosecutor," so to speak, because the prosecutor is presumed to have "exercised independent judgment in determining that probable cause . . . exists."  *Id*. at 266.  Thus, "where police officers do not act maliciously or with reckless disregard for the rights of an arrested person," the prosecutor's independent judgment insulates the police officer from liability for injuries that resulted after the prosecutor files a criminal complaint.  *Id*. at 267; *Barlow*, 943 F.2d at 1136; *Borunda*, 885 F.2d at 1389.

Nonetheless, as shown by the language just quoted, the effect of the independent judgment presumption may be avoided altogether by showing that the police acted "maliciously or with reckless disregard for the rights of the arrested person."  In addition, the independent judgment presumption may be rebutted.  Examples of such rebuttal include a showing that:

- the prosecutor was pressured or caused by the investigating officers to act contrary to his or her independent judgment, *Smiddy*, 665 F.2d at 267;

- the police officers knowingly presented false information to the prosecutor, *id*.;

- the "prosecutor was nothing but a rubber stamp for his investigative staff or the police," *Hartman v. Moore*, 547 U.S. 250, 264 (2006);[6] and

---

[6] *Hartman* held that, in a First Amendment retaliation context, the presumption of independent judgment could be rebutted by showing (1) a retaliatory animus on the part of police and (2) lack of probable cause.  The plaintiff need *not* show, *e.g.*, that the police pressured the prosecutor, that the prosecutor was a "rubber stamp," and so forth. *Hartman* chose this standard because it is difficult to obtain evidence of the prosecutor's state of mind.  Accordingly, *Hartman* set a *lower* standard for rebutting the independent judgment presumption in First Amendment cases: animus plus lack of probable cause. Nonetheless, it endorsed the "rubber stamp" and personal/political gain examples as probative of whether independent judgment was exercised.

1    • the prosecutor persisted with the case because of expected personal or

2        political gain, *id*.

3    "These examples are not intended to be exclusive.  Perhaps the presumption may be

4    rebutted in other ways."  *Smiddy*, 665 F.2d at 267.

5        Arpaio argues that Lovejoy does not have any evidence to rebut the presumption

6    of independent prosecutorial judgment.  To the contrary, Lovejoy has presented sufficient

7    evidence from which a jury could find rebuttal of the independent judgment presumption

8    in at least three ways.

9        First, a jury could conclude that Arpaio acted "with reckless disregard for the

10   rights of" Lovejoy, thus avoiding the independent judgment question altogether.  The

11   press releases, the press conference on the day of Lovejoy's arrest, and the fact that no

12   reasonable official could conclude that the animal cruelty statute applied to Lovejoy

13   could all be reasonably interpreted by the jury as "reckless disregard" of Lovejoy's rights

14   in pursuit of other goals, such as publicity and political gain.

15       Second, rational jurors could infer that Thomas and Aubuchon were pressured or

16   caused by the investigating officers to act contrary to their independent judgment.  On the

17   one hand, Thomas and Aubuchon both testified that they received no pressure.  On the

18   other hand, the jury could reasonably disbelieve that testimony considering the potential

19   professional consequences of admitting to prosecuting under pressure despite their

20   independent judgment.  Further, Arpaio admits that he "take[s] animal cruelty very

21

22       In light of *Hartman*, the Ninth Circuit has since questioned whether a Fourth
Amendment (as opposed to First Amendment) plaintiff  needs to show anything other

23   than lack of probable cause to rebut the presumption of independent judgment.  *Beck v.
City of Upland*, 527 F.3d 853, 864–65 (9th Cir. 2008).  *Beck* left the question unresolved,

24   awaiting "a case in which the answer matters."  *Id*. at 865.  Because the Court concludes
that Lovejoy has enough evidence to satisfy the pre-*Hartman* rebuttal standard, Lovejoy's

25   case is, like *Beck*, not one in which the answer matters — at least not yet.  Depending on

26   the course of trial, the independent judgment presumption may be submitted to the jury,
most likely through an interrogatory or special form of verdict, thus isolating whether

27   *Hartman*'s effect on Fourth Amendment cases must be resolved.

28

serious" and he "may have had a comment [to Thomas]" about Lovejoy's prosecution.  It is also undisputed that Thomas assigned Leonard Ruiz, chief of the trial division, to supervise the prosecution — an assignment which Ruiz believed to be out of the ordinary for a misdemeanor animal cruelty charge.  When Ruiz and his subordinate, Church, raised questions about the propriety of the prosecution (grounded in the actual language of the relevant statutes), Thomas refused to let the case go to incident review.  Trudgian's and Van Brakel's memos also appear to have been disregarded, even though these memos likewise analyzed the statutes' actual language.  When Church and Ruiz declined to continue prosecuting, Thomas reassigned the case to Aubuchon, who persevered with the Sheriff's Office's baseless misreading of the animal cruelty and recklessness statutes. Taken together, a rational inference arises that someone wanted to make sure that Lovejoy was prosecuted no matter what.  If the jury concludes that Arpaio wanted to ensure Lovejoy's *arrest* regardless of Lovejoy's rights, the jury could similarly conclude that Arpaio wanted to ensure Lovejoy's *prosecution* as well, and therefore conclude that Thomas and Aubuchon were pressured by Arpaio.

Third, a rational jury could conclude that, even in the absence of external pressure, Thomas and Aubuchon "rubber stamped" Arpaio's alleged decision — on in other words, that Thomas and Aubuchon simply did not exercise independent judgment.  Evidence rationally supporting such a conclusion includes Arpaio's potential "comment" to Thomas, Thomas's choice to deny Church and Ruiz's incident review request, and Aubuchon's complete acceptance of the Sheriff's Office's indefensible statutory interpretation.

Accordingly, summary judgment on the prosecutorial independence issue is not appropriate.  However, if a jury concludes that Thomas and Aubuchon exercised independent judgment, then Arpaio could only be liable for damages incurred between the arrest and the criminal complaint.  *Smiddy*, 665 F.2d at 267 (police "not liable for damages suffered by the arrested person *after* a [prosecutor] files charges unless the presumption of independent judgment by the district attorney is rebutted" (emphasis

added)).  Whether Arpaio could be liable for post-complaint damages that would have been incurred regardless of the complaint is not before the Court and need not be decided at this time.

## VII.   MUNICIPAL LIABILITY

Lovejoy sued Arpaio in both his individual and official capacities.  A suit against a municipal officer in his official capacity is equivalent to a suit against the municipality. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Under *Monell*, municipal liability may be based on (1) an expressly adopted official policy, (2) a longstanding practice or custom, or (3) the decision of a person with final policymaking authority. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004).  Lovejoy argues that he has raised a triable issue of fact under the third scenario; Arpaio seeks summary judgment to the contrary.

A municipality — here, Maricopa County — may be held liable for constitutional violations when the person who committed the violation was a municipal official with final policymaking authority or when such an official ratified a subordinate's unconstitutional decision or action and the basis for it.  *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2009); *Larez*, 946 F.2d at 646.  "It does not matter that the final policymaker may have subjected only one person to only one constitutional violation."  *Lytle*, 382 F.3d at 983.  "[A] municipality can be liable for an isolated constitutional violation when the person causing the violation has final policymaking authority."  *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) (internal quotation marks and citation omitted); *see also Larez*, 946 F.2d at 646 ("To the extent that the terms 'policy' and 'custom' imply something beyond a single decision, official liability may also be imposed where a first-time decision to adopt a particular course of action is directed by a governmentally authorized decisionmaker.").

As the Court concluded in a prior order, Arpaio is a final policymaker for Maricopa County in the context of criminal law enforcement.  (*See* Doc. 23 at 21–22.) His acts therefore represent official Maricopa County "policy."  Lovejoy has raised a

triable issue of fact here.  Indeed, Lovejoy's *Monell* case is substantially the same as his case against Arpaio personally.   Both depend on proving that Arpaio caused or acquiesced in Lovejoy's arrest, and that Arpaio ensured Lovejoy would be prosecuted or otherwise remains responsible for the prosecution as the continuing injury caused by the arrest.   As discussed above, Lovejoy has sufficient evidence to put those accusations before a jury.

The only difference between Lovejoy's claim against Arpaio personally and Lovejoy's claim against the County is that the County has no qualified immunity defense. *Owen v. City of Independence*, 445 U.S. 622, 657 (1980).   Thus, even if Arpaio was entitled to qualified immunity in his individual capacity (which he is not, *see* Part V.D, *above*), trial would still be necessary on Lovejoy's claim of County liability.   Summary judgment on County liability will therefore be denied.[7]

## VIII.  EQUAL PROTECTION

Arpaio seeks summary judgment on Lovejoy's allegation that Arpaio violated his equal protection rights by selectively arresting and prosecuting him.  The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).  To evaluate this claim, it is first necessary to identify the "others similarly situated."

Lovejoy claims that he was singled out from other police officers whose service dogs died under their care.  Lovejoy alleges that at least four other police dogs died under

---

[7] At oral argument, counsel for Arpaio asserted that Lovejoy had waived his claim against the County because his response to the motion for summary judgment contains nothing about it.  This is incorrect.  Lovejoy's response briefly but adequately addresses the *Monell* basis for County liability, considering that his claim against the County does not materially differ from his claim against Arpaio personally and that the Court previously ruled Arpaio is a final policymaker for the County.  (*See* Doc. 100 at 11 & n.6.)

suspicious circumstances, but that their handlers were never investigated, disciplined, or prosecuted. This Court concluded in a previous order that three of those incidents did not relate to dogs killed by heat exhaustion in a vehicle, and Lovejoy therefore was not similarly situated to the officers involved in those three incidents. (*See* Doc. 23 at 18.)

The Court has not previously addressed the fourth dog death incident — which, like Lovejoy's case, involved a dog trapped in a hot vehicle. In March 2007, a Phoenix Police Department officer left his assigned dog, Top, in his truck for about three hours while he attended to administrative tasks at the Department. The officer left the truck's engine running but forgot to turn on the air conditioning. Top did not die in the truck, but suffered from heat stroke and needed to be euthanized. A Phoenix Police internal investigation determined that the incident was a mistake. A Phoenix Police Commander spoke with Arpaio about the results of the investigation and Arpaio agreed that the Phoenix Police Department could handle it internally. The Sheriff's Office did not investigate.

The Top incident is somewhat more like Lovejoy's situation, but still not sufficiently similar. First, the relevant distinction here is the choice to investigate: Arpaio investigated Lovejoy but not Top's handler. Assuming without deciding that the choice to investigate can create an equal protection claim if there is no rational reason to investigate one person but not another, Lovejoy's reliance on the Top incident fails. Arpaio had learned from a Phoenix Police Commander that Top's handler had left the engine running for three hours, which would only be rational in that situation if the handler thought he had also left the air conditioning running. Thus, such a person could not be consciously disregarding the risk to the dog. To the contrary, the handler thought he had taken steps to protect the dog, although he was mistaken. This shows negligence, not recklessness. By contrast, when Arpaio learned of Lovejoy's case (a day or two after Bandit's death), he knew very few details. Accordingly, Arpaio's choice to investigate Lovejoy does not evince an equal protection violation, and summary judgment on this claim is appropriate.

1

IT IS THEREFORE ORDERED that "Defendants' Motion for Summary

2

Judgment" (Doc. 92) is GRANTED with respect to Plaintiffs' equal protection claim and

3

DENIED in all other respects.

4

Dated this 23rd day of December, 2011.

5

6

7

_____

Neil V. Wake
United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28